Alison P. Adema, SBN 149285
HAHN & ADEMA
501 West Broadway, Suite 1730
San Diego, California 92101-3595
Telephone: (619) 235-2100
Facsimile: (619) 235-2101

*Attorneys for Lucent Technologies Inc.*
*(Additional counsel listed on the last page)*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

LUCENT TECHNOLOGIES INC.,

   Plaintiff,

  v.

GATEWAY, INC., GATEWAY COUNTRY STORES LLC, GATEWAY COMPANIES, INC., GATEWAY MANUFACTURING LLC and COWABUNGA ENTERPRISES, INC.,

   Defendants,

  and

MICROSOFT CORPORATION,

   Intervener.

MICROSOFT CORPORATION,

   Plaintiff,

  v.

LUCENT TECHNOLOGIES INC.,

   Defendant.

LUCENT TECHNOLOGIES INC.,

   Plaintiff,

  v.

DELL INC.,

   Defendant.

Case No. 02-CV-2060-B (CAB)
consolidated with
Case No. 03-CV-0699-B (CAB)
Case No. 03-CV-1108-B (CAB)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LUCENT'S OPPOSITION TO DELL'S MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT OF U.S. PATENT NO. 5,649,131**

Date:     March 2, 2007
Time:     9:00 A.M.
Courtroom:   2
Judge:     Hon. Rudi M. Brewster

## TABLE OF CONTENTS

I.   INTRODUCTION .......................................................................................................1

II.  STATEMENT OF FACTS ........................................................................................2

    A.   Background Of The Invention Of The Ackerman '131 Patent ...............................2

    B.   The Asserted Claims .............................................................................................3

    C.   Dell's Accused Web Sites .....................................................................................3

III. ARGUMENT ............................................................................................................4

    A.   Legal Standard ......................................................................................................4

    B.   Dell's Web Servers Practice The "Transmitting . . . To Said Device" Step............5

        1.   The Court's Construction Of "Transmitting . . . To Said Device" Does
            Not Preclude Network Switching Devices, Nor Did Applicants
            Disclaim Such Devices During Prosecution ................................................6

        2.   The Record Demonstrates That Dell's Host Processors Transmit
            Directly To Terminal Devices Without Retransmission By A Site
            Processor .......................................................................................................9

    C.   Dell's Web Servers Perform The Step of "Assigning An Identifier To A
        Respective One of A Plurality of Input Object Types" .........................................10

    D.   Dell's Web Servers Communicate With A "Terminal Device" ...........................12

        1.   The Terminal Device Manages Its Associated Display Itself...................13

        2.   The Terminal Device Manages Its Internal Memory With The
            Assistance Of The Host Processor ..............................................................15

    E.   Dell Is Not Entitled To Summary Judgment On The Doctrine Of Equivalents ....17

    F.   Dell Directly Infringes The Ackerman '131 Patent .............................................18

    G.   Dell Induces Infringement And Contributorily Infringes The Ackerman '131
        Patent...................................................................................................................19

        1.   Dell's Web Site Users Directly Infringe The Ackerman '131 Patent........19

        2.   Dell Induces Infringement Of The Ackerman '131 Patent.......................19

        3.   Dell Contributorily Infringes The Ackerman '131 Patent........................21

IV.  CONCLUSION .......................................................................................................21

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Amgen v. Hoechst Morion Roussel, Inc.*,
    314 F.3d 1313 (Fed. Cir. 2003).................................................................................... 9, 13, 14

*Amgen, Inc. v. Hoechst Marion Roussel, Inc.*,
    314 F.3d 1313 (Fed. Cir. 2003)............................................................................................. 6

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)........................................................................................................... 4, 5

*Armco, Inc. v. Cyclops Corp.*,
    791 F.2d 147 (Fed. Cir. 1986)................................................................................................ 5

*Becton Dickinson and Co. v. Tyco Healthcare Group LP*,
    No. Civ.A. 02-1694 GMS, 2006 WL 890995 (D. Del. Mar. 31, 2006)................................... 5

*Ciena Corp. v. Corvis Corp.*,
    334 F.Supp.2d 598 (D. Del. 2004)........................................................................................ 6

*Conroy v. Reebok Int'l, Ltd.*,
    14 F.3d 1570 (Fed. Cir. 1994)............................................................................................... 4

*DSU Med. Corp. v. JMS Co., Ltd.*,
    471 F.3d 1293 (Fed. Cir. 2006)..................................................................................... 21, 22

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*,
    339 U.S. 605 (1950).............................................................................................................. 18

*Linear Technology Corp. v. Impala Linear Corp.*,
    379 F.3d 1311 (Fed. Cir. 2004)............................................................................................ 20

*Lucent Techs., Inc. v. Newbridge Networks Corp.*,
    168 F.Supp.2d 181 (D. Del. 2001)......................................................................................... 6

*MEMC Electronic Materials, Inc. v. Mitsubishi Materials Silicon Corp.*,
    420 F.3d 1369 (Fed. Cir. 2005)........................................................................................... 21

*Middleton, Inc. v. Minnesota Mining and Mfg. Co.*,
    311 F.3d 1384 (Fed. Cir. 2002)............................................................................................. 5

*Moleculon Research Corp. v. CBS, Inc.*,
    793 F.2d 1261 (Fed.Cir.1986)............................................................................................. 21

*Online Policy Group v. Diebold, Inc.*,
    337 F. Supp. 2d 1195 (N.D. Cal. 2004) ................................................................................ 5

*Pickholtz v. Rainbow Techs., Inc.*,
    260 F. Supp. 2d 980 (N.D. Cal. 2003) ................................................................ 22

*Schmidt v. Farm Credit Serv.*,
    977 F.2d 511 (10th Cir. 1992) .......................................................................... 5

*Southwall Techs., Inc. v. Cardinal IG Co.*,
    54 F.3d 1570 (Fed. Cir. 1995).......................................................................... 5

*Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*,
    520 U.S. 17 (1997).......................................................................................... 18

*Water Techs. Corp. v. Calco, Ltd.*,
    850 F.2d 660 (Fed. Cir. 1988)........................................................................ 21

**Statutes**

35 U.S.C. § 271(b) ................................................................................................ 18

35 U.S.C. § 271(c) ................................................................................................ 19

# I.     INTRODUCTION

In support of its motion for summary judgment of noninfringement of the Ackerman '131 patent, Dell advances three arguments:   first, Dell argues that it does not infringe based on its application of the Court's construction to the Accused Web Sites; second, Dell argues that it does not infringe under the doctrine of equivalents; and third, Dell argues that it is not liable for inducement of infringement because Lucent has not proven direct infringement by Dell's Web Site users or a specific intent on the part of Dell to induce infringement.  All three arguments fail and should be rejected.

First, Dell attempts to establish noninfringement by improperly adding limitations that do not appear in the asserted claims or this Court's claim construction ruling, and would result in excluding the preferred embodiment.  However, when the claims of the Ackerman '131 patent are properly read in view of the Court's claim construction and are applied to Dell's Accused Web Sites, it is clear that facts exist upon which a reasonable jury could conclude that Dell's Accused Web Sites infringe the claims of the Ackerman '131 patent.

Second, Dell overlooks the record evidence and testimony of Lucent's expert regarding equivalents to the "transmitting . . . to said device" step of the asserted claims.  Lucent's expert has offered evidence upon which a reasonable jury could conclude that this step is equivalently performed by the web servers that host the Accused Web Sites.

Third, as an initial matter, Lucent has offered abundant evidence upon which a reasonable jury could conclude that Dell, by operating the Dell Web Sites, directly infringes the claims of the Ackerman '131 patent.   On the issue of Dell's contributory infringement and inducement of infringement, Dell erroneously contends that Lucent must prove contributory infringement and inducement of infringement on the basis of direct evidence alone.  Because proof of contributory infringement and inducement of infringement can be based on circumstantial evidence, and because abundant circumstantial evidence confirms that Dell has induced and contributed to the direct infringement of the Ackerman '131 patent by Dell's Web Site users, Dell's motion for summary judgment of no contributory infringement and no inducement of infringement should be denied.

## II.       STATEMENT OF FACTS

### A.       Background Of The Invention Of The Ackerman '131 Patent

The Ackerman '131 Patent relates to a novel communications protocol that facilitates communication over a network between a host processor and terminal devices — such as workstations, portable computers, or smart phones — by enabling the exchange of interface information in a manner independent of the varying operating characteristics of the terminal devices.

In modern communications networks, many different types of terminal devices may seek to access the services provided by a host computer. Before the invention of the '131 Patent, a host computer was required to customize display and input commands for each type of terminal device. (Ex. 1,[1] '131 Patent at col. 1, ll. 10–13.) If these commands were not customized, the terminal device might process the commands in ways unintended by the host computer, *e.g.*, by displaying a pattern on a terminal display improperly. (*Id.* at col. 1, ll. 13–18.)

To customize commands for each terminal, a prior art host computer initially requested the identity (or model) of the terminal. (*Id.* at col. 1, ll. 19–22.) The host used this identification to determine the characteristics of the terminal's physical display, such as size, shape, aspect ratio, and display resolution. (*Id.* at col. 1, ll. 22–24.) The host then customized a command to properly display a pattern on that particular terminal's display. Such a display pattern may, for example, be used to solicit user input. (*Id.* at col. 1, ll. 25–42.) But to decipher subsequent user input properly, the host computer continually had to monitor the location of the user's cursor on the particular terminal's display. (*Id.* at col. 1, ll. 43–61.) Thus, for both the display of information sent to the terminal device and the subsequent input of information sent back to the host computer, the host computer at all times needed to maintain precise knowledge of the particular terminal's display. (*Id.* at col. 2, ll. 1–4.)

---

[1]     Citations to exhibits refer to the exhibits attached to the Declaration of Eric Hayes in Support of Lucent's Oppositions To Defendants' Combined Motions For Summary Judgment, filed concurrently herewith.

The invention embodied in the '131 Patent, however, allows a host computer to specify *relative*, rather than specific, attributes for features that are to be displayed on a terminal display, thereby leaving it up to the particular terminal to display an object in accord with its own capabilities.  (*Id.* at Abstract.)  Using the communications protocol of the invention, the host associates different types of input objects with identifiers before transmitting each object type and its associated identifier to the terminal device.  The terminal device displays the object in a form determined by the terminal device but in accordance with respective predefined policies.  (*Id.* at col. 2, ll. 12–21.)  A user at the terminal device can thereafter manipulate displayed objects to input information which is then sent back to the host.  The host processor can decipher this input because data representing a manipulation is transmitted to the host with the object and its associated identifier.  In this manner, the host processor can transmit display patterns that solicit user input, and can subsequently receive understandable input without knowing details regarding the particular characteristics of the terminal device's display.

## B.    The Asserted Claims

Lucent asserts Claims 1–7 and 9–10 of the '131 Patent against Dell.  The claims are directed to a method of operating a host processor communicating with a terminal device.  Claim 1 contains the disputed steps and elements that are common to all of the asserted claims:

> 1.  A method of operating a host processor communicating with a terminal device, said method comprising the steps of
>
> assigning an identifier to a respective one of a plurality of input object types, and
>
> transmitting said identifier and its respective input object type to said device, wherein said plurality of object types includes at least two of the object types choice, entry, text, and image.

(Ex. 1, '131 Patent at col. 17, ll.45–53.)

## C.    Dell's Accused Web Sites

Dell operates, hosts, and conducts business through Internet web sites such as www.dell.com and the domain names identified in Dell's Response to Interrogatory No. 29, Attachment B ("Accused Web Sites").  (*See* Ex. 2, Dell's Resp. to Interrog. No. 29 at Attach. B.)  Dell operates the

1   Accused Web Sites to advertise, sell, and support products and services.  These web sites are hosted

2   by web servers operated by Dell.  (*See id.*; Ex. 3, Declaration of Aga Webb ("Webb Decl.") at ¶ 2.)

3          In response to a request from a user, the Dell web servers use HyperText Transfer Protocol

4   ("HTTP") to transmit web pages structured in HyperText Markup Language ("HTML") to a user at a

5   computing device running a conventional web browser (*e.g.*, Microsoft's Internet Explorer).  (*See*

6   Ex. 4, Expert Report of Nathaniel Polish ("Polish Rep.") at 7; *see also* Ex. 3, Webb Decl. at ¶¶ 2, 5

7   ("When a client computer seeks to access a Dell web page, Dell's website computers automatically

8   generate HTML elements . . . .").)  Many of the transmitted Dell web pages contain the HTML

9   <FORM> tag ("HTML form").  (Ex. 3, Webb Decl. at ¶ 9; Ex. 4, Polish Rep. at 6.)  Each HTML

10  form is composed of HTML form "elements," which are types of displayable graphical objects such

11  as text entry boxes, radio buttons, checkboxes, pull-down menus, etc.  (Ex. 3, Webb Decl. at ¶ 9; Ex.

12  4, Polish Rep. at 7.)  Thus, when a user accesses a web page of the Accused Web Sites that includes

13  the HTML form, the HTML source for that form is transmitted from the web server hosting the

14  Accused Web Site to a user's computing device running a conventional web browser.  (Ex. 4, Polish

15  Rep. at  7.)

16  **III.   ARGUMENT**

17        **A.     Legal Standard**

18        Because summary judgment is properly granted only when "there is no genuine issue as to

19  any material fact," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986), the presence of a

20  genuine issue precludes such relief.  As the moving party, Dell bears the burden of demonstrating the

21  absence of any genuine issue of material fact.  *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1575 (Fed.

22  Cir. 1994).  A genuine issue of material fact exists if a reasonable fact finder could find for the

23  nonmoving party.  *Anderson*, 477 U.S. at 248; *see Online Policy Group v. Diebold, Inc.*, 337 F.

24  Supp. 2d 1195, 1199 (N.D. Cal. 2004)  ("Summary judgment thus is not appropriate if the

25  nonmoving party presents evidence from which a reasonable jury could resolve the material issue in

26  his or her favor.").

27

28

1      In deciding whether such a genuine issue exists, the Court must view the evidence in the light

2  most favorable to the nonmovant and draw all reasonable inferences in that party's favor. *See id.* at

3  255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be

4  drawn in [its] favor.").  To defeat a motion for summary judgment, the nonmovant "is required

5  merely to point to an evidentiary conflict created on the record" as to any material fact. *Armco, Inc.*

6  *v. Cyclops Corp.*, 791 F.2d 147, 149 (Fed. Cir. 1986) (reversing the district court's grant of summary

7  judgment where evidence of a factual dispute existed).  "Whether the accused device contains each

8  claim limitation, as properly construed, or its equivalent, is a question of fact." *Middleton, Inc. v.*

9  *Minnesota Mining and Mfg. Co.,* 311 F.3d 1384, 1386 (Fed. Cir. 2002) (citing *Southwall Techs., Inc.*

10  *v. Cardinal IG Co.,* 54 F.3d 1570, 1575 (Fed. Cir. 1995)).  Where the evidence presents a close

11  question that could be resolved either way by a jury, summary judgment should be denied. *See, e.g.,*

12  *Schmidt v. Farm Credit Serv.*, 977 F.2d 511, 516 (10th Cir. 1992).

13      Finally, courts are reluctant to entertain attempts at reargument of prior claim constructions.

14  *See Becton Dickinson and Co. v. Tyco Healthcare Group LP*, No. Civ.A. 02-1694 GMS, 2006 WL

15  890995, *7 (D. Del. Mar. 31, 2006) (rejecting movant's attempt to change scope of claim on motion

16  for summary judgment as "improper attempt to reargue claim construction") (attached as Ex. 5);

17  *Ciena Corp. v. Corvis Corp.*, 334 F. Supp. 2d 598, 608 (D. Del. 2004) (rejecting infringer's attempts

18  to distinguish accused system as reargument of claim construction); *Lucent Techs., Inc. v.*

19  *Newbridge Networks Corp.*, 168 F. Supp. 2d 181, 214 (D. Del. 2001) (rejecting defendant's attempt

20  to reargue claim construction).

21      **B.    Dell's Web Servers Practice The "Transmitting . . . To Said Device" Step**

22      When a user at a computing device running a web browser accesses a Dell Web Site, the Dell

23  web server (a computer) hosting that Web Site communicates over the Internet with the user by

24  sending information to the user's terminal device.  Dell does not dispute Lucent's contention that the

25  Dell web server hosting the Dell Web Site constitutes a "host processor" under the Court's claim

26  construction, *i.e.* "a computer that communicates with one or more users to provides services such as

27  transaction processing or database access."  (*See, e.g.*, Ex. 4, Polish Rep. at D-1; Ex. 6, Amended

28

Order Superseding The Order Of November 17, 2003, Construing Claims For U.S. Patent Number 5,649,131 ("Amended Order") at 4.)  Dell contends that its web servers do not perform the step of "transmitting . . . to said device" ("transmitting" step) because the web servers transmit HTML forms over the Internet to a user, which Dell claims is not a "direct" transmission.  (Dell Br. at 13 (D.I. 915).)  Dell's interpretation of the Court's claim construction would preclude the preferred embodiment of the Ackerman '131 patent, a result that is "rarely, if ever, correct."  *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1349 (Fed. Cir. 2003) (internal citation omitted).

In addition, Dell's argument seeks to resurrect a proposed claim construction already rejected by this Court.  During claim construction proceedings, Dell unsuccessfully urged the Court to construe the "transmitting" step as requiring a dedicated, "hard-wired" connection, with no intermediary device of any kind between the host processor and terminal device.  (Ex. 8, Sept. 25, 2003 Hr'g Tr. at 234:21–236:15.)  Having lost that construction, Dell now attempts to "re-construe" the Court's construction of "transmitting . . . to said device" to achieve the same end, arguing that the mere presence of network switching devices avoids infringement.  In doing so, Dell ignores the language of the Court's construction, as well as the specification and prosecution history of the '131 Patent.

> 1. **The Court's Construction Of "Transmitting . . . To Said Device" Does Not Preclude Network Switching Devices, Nor Did Applicants Disclaim Such Devices During Prosecution**

During prosecution of the application that issued as the '131 patent, the Examiner rejected Claim 1 (application Claim 5) over U.S. Patent No. 5,303,042 to Lewis, *et al*. ("Lewis"). (*See* Ex. 9, '131 File History at LUC 1101279.)  The applicants traversed this rejection by noting that, unlike the claimed invention, the system of the Lewis patent transmitted display information from a host processor to a site processor, which then subsequently retransmitted that display information to terminal devices:

> Thus, in Lewis display information is first transmitted from the host to site processor, which then retransmits the display information to the terminal devices.  The claimed invention is DIFFERENT.
> Specifically, in the claimed invention, the host communicates display information directly to a terminal, as is particularly set forth in claims

1          5 and 6 at lines 6-7.  Thus, the claimed invention is unlike the
apparatus disclosed in Lewis.

2   (*Id.* at LUC 1101289.)  The Examiner thereafter allowed the claim.

3         Lewis disclosed a remote educational instruction system in which an instructor at a host site

4   could administer quizzes to students at a remote site.  (Ex. 52, Lewis Patent at col. 1, l. 19–col. 2, l.

5   31.)  A host computer at the host site would first initialize a "site controller" located at the remote

6   site by transmitting display information to the site controller.  (*See, e.g., id.* at col. 8, l. 62–col. 9, l.

7   7.)  Thereafter, the local site controller — and ***not*** the host computer — would actively manage the

8   students' keypad terminals by translating and formatting the information initially received from the

9   host computer into messages suitable for the keypad terminals:

10          At this point, **site controller 50 will setup login prompts on initialized
keypads** if student logins are enabled (flag included in site number

11          assignment field).

12          *   *   *

13          After receiving a login enable message site controller **50** checks the
state of the enable flag, if the state is zero (disabled), **site controller 50**

14          **downloads display messages with a login disabled message to all
response keypad terminals 52 not logged in.  If the login state is one**

15          **(enabled), site controller 50 sets up all response keypad terminals 52**
not already logged in with a login prompt utilizing terminal input

16          messages.

17          *   *   *

18          ***Site controller 50 initializes keypad terminals 52, giving them a
prompt to display.***  A student then typically types in an ID code that is

19          then packaged up and sent back in a message to the network manager
**500**."

20  (*Id.* at col. 9, ll. 12–15; col. 9, ll. 35–42; col. 16, ll. 2–6 (emphases added).)

21        Moreover, while the host computer in Lewis had responsibility for global initiation of a quiz,

22  it was the site controller — not the host computer — that prompted the display of quiz questions on

23  a keypad terminal and solicited input from the terminal:

24          The host site **12** then sends an exam start message to site controller **50**

25          to begin the exam.  At this time site controller **50** broadcasts a set
mode with a mode of quiz to each response keypad terminal **52** which

26          is logged in causing the response keypad terminal **52** to display the
first exam question on the response keypad terminal **52** display

27          included in terminal **52**. Students responses are detected by site
controller **50** via question response messages from the keypad

28

1    response terminals **52** in response to poll messages from the site
     controller **50**.

2  (*Id.* at col. 20, ll. 40–49.)  Thus, the host computer in Lewis did ***not*** transmit to individual terminal

3  devices, but rather transmitted information to a site processor, which in turn used that information to

4  act as a secondary processor in transmitting to the terminal devices and actively managing display

5  information to be sent to keypad terminals.   This is the point made by the applicants in

6  distinguishing Lewis from the claims of the Ackerman '131 patent, which expressly requires that the

7  host processor transmit directly to individual terminal devices, rather than first to another processor

8  that would act as a type of subordinate processor.

9        Importantly, nowhere in the prosecution history did the applicants disclaim the use of

10  networks or network switching devices to transmit information from a host processor to a terminal

11  device.  The Lewis system — as reflected in Figure 1 of that patent — employed an "X.25 Public

12  Packet Switched (Data)" network to transmit information from the host computer to the site

13  controller.   At no time did applicants suggest that the presence of this X.25 network distinguished

14  the Lewis system from the claimed invention.

15        Nor would such a distinction be reasonable.  The Ackerman '131 patent itself discloses a

16  preferred embodiment in which information is transmitted from a host processor to a smart phone

17  over a telephone network.  (*See, e.g.*, Ex. 1, '131 Patent at col. 2, l. 64–col. 3, l. 33.)  Like the X.25

18  network of Lewis, public telephone networks at the time the application for the '131 patent was filed

19  contained intermediate network devices, such as switches and exchanges, to forward information

20  transmitted over those networks.  (Ex. 7, February 9, 2007 Declaration of Nathaniel Polish ("Polish

21  Decl.") at ¶ 14.)  Indeed, a comparison of Figure 1 of the Ackerman '131 patent with Figure 1 of

22  Lewis demonstrates that it is Lewis's use of a site controller that distinguishes Lewis from the

23  claimed invention, and not the presence of network switching devices, which are employed by the

24  systems described in both Lewis and the Ackerman '131 patent.  (*See id.* at Ex. 1.)

25        Dell ignores these facts in suggesting that the Court's construction of "transmitting . . . to said

26  device" implies a dedicated, hard-wired connection between a host processor and a terminal device.

27  By emphasizing "direct" transmission, however, applicants disclaimed the use of a ***site processor*** —

28

an intermediate computer, like the one in Lewis, that manages display information — and **not** the network switching devices.  Dell's argument to the contrary would yield a construction that excludes the preferred embodiment of the '131 patent, a result that is "rarely, if ever, correct."  *Amgen*, 314 F.3d at 1349.  As it did before, this Court should reject that untenable construction.

**2.  The Record Demonstrates That Dell's Host Processors Transmit Directly To Terminal Devices Without Retransmission By A Site Processor**

The record demonstrates that Dell's web servers practice the step of "transmitting . . . to said device" as required by the asserted claims.

Dell's web servers transmit display information — HTML forms — directly to terminal devices accessing the web sites through a web browser.  For example, in response to a user accessing a web page that contains an HTML form, the Dell web server transmits HTML forms in HTTP packets addressed to the web browser of the user's terminal device.  (Ex. 3, Webb Decl. at ¶¶ 2, 5; Ex. 4, Polish Rep. at 7; Ex. 7, Polish Decl. at ¶¶ 4–7.)  Packets containing the HTML form information typically pass through the nodes of the Internet, such as network switching and routing devices, in order to arrive at a terminal device.  (Ex. 3, Webb Decl. at ¶ 3; Ex. 7, Polish Decl. at ¶¶ 15–19).)  Importantly, the network switches and routers do not manipulate the display information contained in the packet, which is solely intended for the terminal device.  (Ex. 7, Polish Decl. at ¶¶ 17, 20.)  In fact, the network switching devices are unaware of the nature of the information contained in the packets being forwarded and the behavior of the intermediate switches does not change based on the contents of the packet.  (*Id.*)  Because the contents of the packet sent from the host processor arrive at the terminal device unmodified, the transmission is direct regardless of the presence of the network switching devices, which are therefore not considered "site processors."

Dell strains to avoid infringement by suggesting that Dell's web pages **may** be reformatted for PDAs and cell phones through a proxy server like Skweezer, which allegedly interposes a nonconventional web browser between the user and the host processor.  (*See* Dell Br. at 15; Ex. 51, Kelly Rebuttal Rep. at ¶ 80.)  Dell's argument is a red herring.  Even if, for sake of argument, a proxy server like Skweezer were to render those particular uses non-infringing, such noninfringing

1  uses are *de minimis*.  The vast majority of computers purchased since 1997 have a conventional

2  browser such as Microsoft's Internet Explorer, Netscape, Mozilla, or Firefox already preinstalled at

3  the factory, and these conventional browsers represent the vast majority of browser use in the market

4  from 1997 to today.  (Ex. 7, Polish Decl. at ¶ 22.)  Thus, Dell cannot legitimately dispute that all but

5  a *de minimis* number of communications from Dell's web servers do ***not*** go through a proxy server

6  such as Skweezer.[2]  At any rate, whether or not a handful of PDA users visited Dell's Web Sites

7  through Skweezer is hardly the issue.  Dell need not infringe 100% of the time to be liable for its

8  infringement.

9       Lucent has provided sufficient evidence upon which a reasonable jury could determine that

10  Dell infringes the asserted claim so the Ackerman '131 patent.

11
12      **C.**  **Dell's Web Servers Perform The Step of "Assigning An Identifier To A Respective One of A Plurality of Input Object Types"**

13       Dell admits that its web servers assign an identifier, but disputes that the identifier is assigned

14  to an input object type.  (Dell Br. at 16.)  Dell argues that the HTML "NAME" (or label) is assigned

15  to an input object and not to "each one of a plurality of input object types."  (Dell Br. at 16.)  Dell's

16  argument is based on a misunderstanding of the meaning of the Court's claim construction and

17  should be denied.

18       The Court has construed "identifier" to refer to "a unique label assigned to identify each one

19  of a plurality of input object types and, if any, each one of a plurality of group identifier types."  (Ex.

20  6, Amended Order at 4.)  The Court has construed "input object type" to refer to "a kind of

21

22  ───────────────
23  [2]     Significantly, Dell's own declarant regarding the operation of the Accused Web Sites and Dell web servers does ***not*** state that Dell's web servers communicate through proxy servers such as Skweezer.  To the contrary, she admits that "Dell's web servers communicate website information over the Internet ***in the standard manner*** — *i.e.*, messages are divided into packets and those packets are transmitted from Dell's web servers through a series of intermediate "nodes" to the eventual destination."  (Ex. 3, Webb Decl. at ¶ 3 (emphasis added).)  The Webb Declaration supports Lucent's contention that Dell's web servers do not in fact communicate through proxy servers such as Skweezer, but rather communicate "directly," "in the standard manner," over the Internet.

27
28

1   displayable graphical symbol that is suitable for display on a user's terminal device and that

2   generates particular input when touched, or manipulated, by a user." (*Id.* (emphasis added).)

3   Examples of input object types are "choice," "entry," "text," and "image." (*Id.* at 5.)

4       There is no dispute that "Dell's web servers send web pages rendered in HTML web page

5   format to client computers," including HTML forms. (Ex. 3, Webb Decl. at ¶¶ 8–9; Ex. 4, Polish

6   Rep. at D-1–4.) However, Dell contends that when a Dell web server transmits an HTML form to a

7   terminal device, it transmits a "'NAME' label [that] identifies only a particular FORM element; it

8   does not identify '**each one** of a plurality of input object **types**.'" (Dell Br. at 16.) In other words,

9   Dell argues that the web server assigns an identifier to an input object rather than an input object

10  type.

11      Dell's argument is based on a misunderstanding of the difference between input objects and

12  input object types. Under the Court's construction, an "input object **type**" is a "**kind** of displayable

13  graphical symbol," not the symbol (or input object) itself. (*See* Ex. 6, Amended Order at 4.) Dell's

14  web servers do assign an identifier to an input object type: the web server assigns an identifier (*e.g.*,

15  "INPUT NAME = . . . "), along with its input object type (*e.g.*, "TYPE = . . . "), to the terminal

16  device so that an input object (*e.g.*, a text box, drop-down menu, checkbox, etc.) is created and

17  displayed to the user. (Ex. 4, Polish Rep. at 8–9.)

18      By way of example, Figure 1 below depicts a "TEXT" HTML form element (the "input

19  object") as displayed on a user's display, along with the corresponding portion of the HTML form

20  commands (the "input object type" and its associated "identifier") that were transmitted from Dell's

21  web server to the user's terminal device in order to create that particular "TEXT" HTML form

22  element. (*Id.*)

23
        Service Tag  [          ]          . . .Service Tag </td><td align="left"><**input
24                                          name="ServiceTag"** id="ServiceTag" **type="text"**
                                            maxlength="7" size="12" /> . . .
25
                                            (Source: *http://support.dell.com/support/
26                                          supportrequests/create.aspx?request=true*
                                            ?c=us&l=en&s=gen, LUC 1265307, results1.html)
27
                                            **Figure 1**
28

As the figure above shows, a name (here, **input name="Service Tag"**) is assigned to its respective input object type (here, **type="text"**) in order to create that particular text box object on the display and to distinguish that particular object from a plurality of other objects on the display. (Ex. 4, Polish Rep. at 8.)

Thus, record evidence exists from which a reasonable jury could conclude that Dell's web servers perform the step of "assigning an identifier to a respective one of a plurality of input object types."

### D.     Dell's Web Servers Communicate With A "Terminal Device"

When a user at a computing device running a web browser accesses a Dell Web Site, the Dell web server (a computer) hosting that Web Site communicates over the Internet with the user by transmitting information to the user's computing device.  Dell does not dispute Lucent's contention that the Dell web server hosting the Dell Web Site constitutes a "host processor" under the Court's claim construction, *i.e.* "a computer that communicates with one or more users to provides services such as transaction processing or database access."  (*See, e.g.*, Ex. 4, Polish Rep. at D-1; Ex. 6, Amended Order at 4.)  However, Dell contends that the web servers do not communicate with a "terminal device" as set forth in the asserted claims.  (Dell Br. at 2, 17–20.)  Dell impermissibly reads limitations into the claims that are not present in the Court's claim construction and that would result in the exclusion of the preferred embodiment, a result that is "rarely, if ever, correct."  *Amgen*, 314 F.3d at 1349 (internal citation omitted).

The Court has construed "terminal device" to mean "a computing device such as a data terminal, workstation, portable computer, or smart phone that enables a user to communicate with a host processor.  It manages its associated display itself and manages its internal memory with the assistance of the host processor."  (Ex. 6, Amended Order at 4.)

The invention of the Ackerman '131 patent is directed to "a communications protocol which facilitates the exchange of interface information between a host processor and a terminal."  (Ex. 1, '131 Patent at Abstract.)  In the preferred embodiment, a host processor transmits information to a smart phone "to specify relative rather than specific attributes for an object that is to be displayed on

1    the terminal display, thereby leaving it up to the terminal to display an object in accord with its own

2    capabilities." (*Id.*)  Thus, the host processor influences the appearance of objects on the display, but

3    does not manage the terminal's associated physical display.  Similarly, Dell's web servers send

4    HTML <FORM> commands to a computing device that influence the presentation characteristics of

5    an object that is to be displayed on the terminal display.  These HTML <FORM> commands do not,

6    however, in any way manage the actual physical display hardware of that device.  As the

7    specification indicates, it is up to the device communicating with the web server to manage its own

8    physical display.  Thus, Dell's web servers communicate with a device that "manages its associated

9    display itself."

10        In the preferred embodiment, a host processor transmits information to a smart phone that is

11   stored in the smart phone's internal memory.  (*Id.* at col 3, ll. 60–64.)  In this way, the host processor

12   assists the smart phone terminal device with memory management.  Similarly, Dell's web server

13   sends HTML <FORM> commands to a computing device that are stored in the internal memory (or

14   memory cache) of the device so that the device can re-access those commands in the future.

15        Thus, and as explained more fully below, Dell's web servers communicate with a "terminal

16   device" that "manages its internal memory with the assistance of the host processor."   Dell's

17   argument to the contrary would yield a construction that excludes the preferred embodiment of the

18   '131 patent and should accordingly be rejected.  *Amgen*, 314 F.3d at 1349.

19              **1.     The Terminal Device Manages Its Associated Display Itself**

20        Dell argues that the computing devices that receive HTML commands from the web server

21   that "specify the details of how information is displayed on a client computer's display" do not

22   manage their associated display themselves.  (Dell Br. at 18.)  Dell's interpretation of "display" adds

23   a limitation to the claims not present in the Court's claim construction or the specification, would

24   result in excluding the preferred embodiment, and should therefore be rejected.  *Amgen*, 314 F.3d at

25   1349.

26        The Court's claim construction is taken directly from the Ackerman '131 patent's

27   specification:  "In accord with the principles of the invention, a terminal that is communicating with

28

1   transaction processor **200** manages its associated display itself, and manages its internal memory

2   with the assistance of processor **200**."  (Ex. 1, '131 Patent at col. 6, ll. 61–65.)  It is important to read

3   this construction in light of the immediately preceding sentence of the specification:  "A station set,

4   such as station set **10** (FIG. **1**) may have one or more limitations, namely, the size of its associated

5   display and internal memory."  (*Id.* at col. 6, ll. 59–61.)  This sentence refers to the size limitations

6   of the terminal device's ***physical hardware*** — the display and memory.  The following sentence —

7   that the "terminal device manages its associated display itself and manages its memory with the

8   assistance of the host processor" — therefore similarly refers to the display hardware and memory

9   hardware.  Thus the claim construction that "the terminal device manages its associated display

10  itself" means that the terminal device manages its physical display hardware without any help from

11  the host processor, and does not mean, as Dell contends, that the host processor cannot assist the

12  terminal device with the formatting of displayable graphical symbols.

13          Indeed, if the host processor were not allowed to send commands to the terminal device that

14  affect the appearance of displayable objects, the preferred embodiment would be excluded.  In the

15  preferred embodiment, a host processor sends formatting commands or "interface information" (*id.*

16  at Abstract) to a smart phone in the form of input object types and their associated identifiers.  In

17  these formatting commands, an "object type is associated with a set of properties that is used to

18  determine how the associated object type is to be displayed."  (*Id.* at col. 5, ll. 33–35.)  The host

19  processor can, for example, send commands to the terminal device that affect the presentation of

20  objects, such as by hiding objects (*id.*, col. 5, ll. 44–49), highlighting objects (*id.* at col. 5, l. 65–col.

21  6, l. 1), and positioning objects within abstract regions of the display (*id.* at col. 8, ll. 12–15).  After

22  the host processor transmits such properties and attributes, the terminal device then "interprets a set

23  of properties, as well as associated attributes . . . in accord with its own capabilities to create an

24  object, or graphical symbol, characterizing the type of object specified in the associated CREATE

25  command . . . ."  (*Id.* at col. 5, ll. 35–40.)  Although the host processor can specify the relative,

26  formatting-related aspects of an object's appearance, it does not thereby control the physical screen

27  or display hardware.  Any positioning information that is sent by the host to the terminal device

28

merely pertains to the relative positioning of an object within a window and not the positioning of an object at a certain pixel location on the physical screen.  (*See id.* at col. 8, ll. 15–18 ("It is to be understood, however, that the way in which a display is ***actually*** partitioned into such regions is ***under the control of the station set or computer terminal***.") (emphasis added); Ex. 7, Polish Decl. at ¶ 9.)  Thus, the host specifies the formatting for the display of certain objects and then leaves is up to the terminal device to actually create and display the objects according to the terminal device's ability to do so.

Working just like the host processor in the specification, Dell's web servers send formatting commands in HTML ("HyperText Markup Language") to the terminal device.  HTML is a de facto formatting language used on the World Wide Web.  (*See* Ex. 4, Polish Rep. at  6; Ex. 3, Webb Decl. at ¶ 4.)  The HTML <FORM> commands format the appearance of objects on a display, but do not control or in any way manage the physical screen or display hardware of the terminal.  Dell's web server leaves it up to the terminal to manage the actual, physical display.  (Ex. 7, Polish Decl. at ¶ 9.)  Thus, Dell's web servers communicate with a computing device "that manages its associated display itself."

### 2.    The Terminal Device Manages Its Internal Memory With The Assistance Of The Host Processor

Dell claims that its web servers do not communicate with a "terminal device" because the web servers "have no information about any client computer's memory" and "'exercise no control over how information is arranged or otherwise stored in the client computer's memory.'"  (Dell Br. at 19–20.)  As a result, Dell contends that the client computers cannot be deemed "terminal devices."  To support its contention, Dell reads in a limitation not present in the Court's claim construction of "terminal device."  The Court's construction does not require that the host processor "control" the memory of the terminal device, just that it "***assist***" the terminal device with internal memory management.  (*See* Ex. 6, Amended Order at 4.)

In addition to impermissibly reading in a limitation not present in the Court's claim construction, Dell ignores statements in the specification that describe how the terminal device manages its memory with the assistance of the host processor.  For instance, the specification states

that the capability of a terminal device to request needed display elements from the host processor allows the terminal device to erase previously stored display elements to "'free up' memory space":

> It is noted that, due to memory limitations, a station set, e.g., station set 10, may, on its own initiative, erase a group of objects from its internal memory in order to "free up" memory space for the creation of a new group of objects.  Thereafter, if station set 10 receives a processor 200 command identifying the erased group of objects, then station set 10, in response to that command, may request a retransmission of the processor 200 commands that created the erased group of objects.

(Ex. 1, '131 Patent at col. 4, ll. 33–41.)  This passage from the specification shows that when the host processor transmits commands to the terminal device to create objects, those objects are stored in the internal memory of the terminal device until they are deleted to free up memory.  Subsequently deleted objects can be transmitted again from the host processor and stored again in the internal memory of the terminal device.  In this manner, the host processor assists the terminal device with management of its internal memory.

Like the system described in the specification of the Ackerman '131 patent, the computing devices that communicate with the Dell Accused Web Sites manage their internal memory with the assistance of the Dell web servers.  A web browser running on a user's computing device typically maintains internal memory called a "cache" for storing HTML pages, including HTML forms, received from Dell's web server.  Once the data is stored in the cache, future use can be made by accessing the cached copy rather than refetching or recomputing the data.  (Ex. 7, Polish Decl. at ¶ 10; Ex. 4, Polish Rep. at D-1–2.)  If the computing device has deleted the HTML form from its cache, the cache is consulted and found not to contain the desired HTML form.  The terminal device in such a situation re-requests the HTML form from the host processor because it cannot load the form from its cache memory.  The host processor, in response to the request, transmits the HTML form to the terminal device, and the terminal device once again stores the form in its cache for future use.  (Ex. 7, Polish Decl. at ¶ 11.)  The record accordingly demonstrates that Dell's web sites communicate with "terminal devices" that "manage their internal memory with the assistance of the Dell web server."

1   Based on the foregoing, Lucent has presented facts upon which a reasonable jury could

2   conclude that the Dell web servers communicate with a "terminal device" according to the Court's

3   construction.

4   **E.   Dell Is Not Entitled To Summary Judgment On The Doctrine Of Equivalents**

5   Dell also seeks summary judgment that the Accused Web Sites do not infringe under the

6   doctrine of equivalents.  (Dell Br. at 21.)

7   Under the doctrine of equivalents, "a product or process that does not literally infringe upon

8   the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence'

9   between the elements of the accused product or process and the claimed elements of the patent

10   invention."  *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997).  The

11   proper inquiry is whether "the accused product or process contain[s] elements identical or equivalent

12   to each claimed element of the patented invention."  *Id.* at 40.  An element in the accused process is

13   equivalent to a claim limitation if the differences between the two are "insubstantial" to one of

14   ordinary skill in the art.  *See id.* at 24–25.  Another relevant consideration is whether the missing

15   element in the accused device "performs substantially the same function in substantially the same

16   way to obtain the same result" as the claim limitation.  *Graver Tank & Mfg. Co. v. Linde Air Prods.*

17   *Co.*, 339 U.S. 605, 608 (1950); *see also Warner-Jenkinson*, 520 U.S. at 39–40.

18   The Court has construed the "transmitting . . . to said device" step to mean "transmitting

19   information directly to the device without first transmitting it to a site processor which then

20   retransmits it."  (Ex. 6, Amended Order at 5.)  The Court's construction defines the step at least

21   partially in terms of what it ***does not do***, namely, transmit first to a site processor.  As the Ackerman

22   '131 patent itself makes clear, direct transmission is not relegated to a hard-wired connection

23   between terminal and device and can include, as the preferred embodiment demonstrates,

24   transmission across a network.  Networks typically consist of switches and routers that forward

25   packets containing information, but do not alter the information in those packets.  (*See* Ex. 7, Polish

26   Decl. at ¶¶ 18, 20.)

27

28

Dell claims that Lucent is precluded from relying on an equivalent to the "transmitting" step because Lucent has allegedly failed to come forward with evidence of equivalents to that step.  But Dell overlooks the deposition testimony of Lucent's expert regarding the "transmitting" step in which he explained that any device between the host processor and terminal that does not translate, format, or actively manage the information sent from the host processor, does not constitute a site processor and therefore allows for a direct transmission.  (*See, e.g.*, Ex. 50, Polish Dep. Tr. at 36–42.) Regarding direct transmissions that pass through intermediary devices, Dr. Polish's testimony indicates that any intermediary network device that does not function equivalently to the site processor of Lewis allows for direct transmission in substantially the same way to obtain the substantially the same result as the claim limitation.  *See Graver Tank*, 339 U.S. at 608.  At the very least, Lucent has offered evidence upon which a reasonable juror could conclude that equivalents to the "transmitting . . . to said device" step exist.  Dell's motion for summary judgment of noninfringement under the doctrine of equivalents should be denied.

### F.    Dell Directly Infringes The Ackerman '131 Patent

Dell claims that Lucent has not offered evidence of direct infringement of the Ackerman '131 patent.  (Dell Br. at 22.)

To the extent Dell contends that Lucent has not offered evidence that ***Dell*** directly infringes the asserted claims of the Ackerman '131 patent, Lucent responds that it has produced abundant evidence of Dell's direct infringement.  It is undisputed that Dell operates the web servers that host the Accused Web Sites and that these Web Sites employ HTML form structures.  (Ex. 3, Webb Decl. at ¶ 2, 5, 9.)  In response to a request from a user for a web page on the Dell Web Site that employs the HTML form structure, the Dell web server performs all of the steps of the asserted claims of the Ackerman '131 patent.  (*See* Ex. 4, Polish Rep. at 5–13 and Attach. D; Ex. 7, Polish Decl. at ¶¶ 2–7; Ex. 55, Dell Screen Shots and HTML Source.)  Lucent has therefore provided evidence upon which a reasonable jury could conclude that Dell directly infringes the asserted claims of the Ackerman '131 patent, precluding summary judgment of noninfringement.

### G. Dell Induces Infringement And Contributorily Infringes The Ackerman '131 Patent

Contrary to Dell's assertion (Dell Br. at 22), Lucent has provided evidence of direct infringement by Dell's Web Site users, as well as evidence of Dell's inducement of infringement and contributory infringement.

#### 1. Dell's Web Site Users Directly Infringe The Ackerman '131 Patent

Although not directly infringing, a party may still be liable for inducement or contributory infringement of patent claims if it enables its customers to directly infringe the patent claims. *See Linear Technology Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1326 (Fed. Cir. 2004). "Liability for either active inducement of infringement or for contributory infringement is dependent upon the existence of direct infringement" by others. *Id.*

Dell claims that there is "no evidence of [] direct infringement by others, [so] Dell is entitled to summary judgment." This assertion flies in the face of the record evidence. Dell's own declarant, Ms. Webb, admits that the Accused Web Sites contains HTML forms and that as soon as a user requests a Dell web page, "Dell's website computers automatically generate HTML elements . . . [and] a Dell web server then transmits the file over the Internet to the client computer." (Ex. 3, Webb Decl. at ¶¶ 4, 5, 9.) The Webb Declaration itself constitutes an admission that Dell's users directly infringe because the users, by accessing Dell Web Sites that employ the HTML form structure, invoke the web servers to perform the patented method. (Ex. 4, Polish Rep. at 5–13.) In addition, because Dell transacts business with its customers through the use of HTML order forms, evidence of Dell's Web Site sales constitutes additional evidence of direct infringement by Dell's Web Site users. (*See* Ex. 53, Kettler Dep. Tr. at 41-43, 45-47, 49-52, 54 (testifying as to Dell's Web Site sales).)

#### 2. Dell Induces Infringement Of The Ackerman '131 Patent

The patent laws provide that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). A party is liable for inducing infringement when it "actively and knowingly" aided another's direct infringement. *See DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006).

Dell cannot ignore the considerable indirect and circumstantial evidence of its intent to induce infringement.  To prove inducement, "direct evidence is not required; rather, circumstantial evidence may suffice."  *MEMC Electronic Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1378 (Fed. Cir. 2005), *citing Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed. Cir. 1988).  Further "[t]he requisite intent to induce infringement may be inferred from all of the circumstances." *MEMC Electronic Materials*, 420 F.3d at 1380.  Indeed, courts have recognized that the requisite intent to establish inducing infringement may certainly be shown by indirect and circumstantial evidence regarding the intended use of a computer product:

> "*In Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed.Cir.1986), the court held that circumstantial evidence of product sales and instructions indicating how to use the product was sufficient to prove third party direct infringement in an inducement-to-infringe claim. The court stated that "[i]f [defendant] is arguing that proof of inducing infringement or direct infringement requires direct, as opposed to circumstantial evidence, we must disagree. It is hornbook law that direct evidence of a fact is not necessary." *Id.* The circumstantial evidence presented by [patentee] supports a reasonable inference that third party users of [the accused infringer's] products use them in combination with a computer having the claimed hardware elements. . . .   Therefore, a genuine issue of material fact exists."

*See Pickholtz v. Rainbow Techs., Inc.*, 260 F. Supp. 2d 980, 983 (N.D. Cal. 2003) (denying summary judgment of no-inducing-infringement based on indirect evidence) (internal citation omitted).

Dell does not deny, and cannot deny, that it intends for its customers to use its Web Sites, including the interactive HTML forms on those websites.  "Evidence of 'active steps ... taken to encourage direct infringement,' such as advertising an infringing use or instructing how to engage in an infringing use, show an affirmative intent that the product be used to infringe . . . ."  *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) (*en banc* on the issue of inducement). Dell takes active steps to encourage direct infringement by using interactive Web Sites to solicit input from Dell Web Site users, by instructing users how to complete the HTML forms on the Web Sites, and by encouraging users through extensive advertising to visit and use its Web Sites.  *See DSU*, 471 F.3d at 1306.

1    Lucent has offered evidence upon which a reasonable jury could conclude that Dell actively

2    induces its Web Site users to infringe, precluding entry of summary judgment of no inducement of

3    infringement.

4            **3.       Dell Contributorily Infringes The Ackerman '131 Patent**

5            "Whoever offers to sell or sells within the United States . . .  an apparatus for use in

6    practicing a patented process . . . knowing the same to be especially made or especially adapted for

7    use in an infringement of such patent, and not a staple article or commodity of commerce suitable for

8    substantial non-infringing use, shall be liable as a contributory infringer."  35 U.S.C. § 271(c).

9            Dell does not deny that it conducts business through its Internet web sites, where it

10   advertises, sells, and supports products and services.  (Ex. 4, Polish Rep. at 5.)  Nor does Dell deny

11   that its Web Sites allow — and indeed encourage — customers to use HTML forms to complete

12   transactions, thereby infringing the patented method of the '131 patent.  *See DSU Med. Corp.*, 471

13   F.3d at 1303 (the proper contributory infringement analysis requires assessing the apparatus in its

14   infringing configuration).  Furthermore, Dell has not offered evidence of any non-infringing use.

15   There is no evidence that a Dell Web Site user can fill out an HTML form on Dell's interactive Web

16   Site *without* infringing the claims of the '131 patent.  (Ex. 4, Polish Rep. at 11–13.)  Dell, by

17   conducting business on its Internet Web Sites through the use of HTML forms, contributes to the

18   direct infringement of the Ackerman '131 patent by its Web Site users.

19           Because Lucent has offered proof upon which a reasonable juror could conclude that Dell

20   contributorily infringes, Dell's motion for summary judgment of no contributory infringement should

21   also be denied.

22   **IV.    CONCLUSION**

23           For the foregoing reasons, Lucent respectfully requests that the Court deny Dell's motion for

24   summary judgment of noninfringement because genuine issues of material fact exist.

25

26

27

28

1

2    Dated:  February 9, 2007                         *Lucent Technologies Inc.*

3

4                                                     By:  _____s/Alison P. Adema_____
                                                          Alison P. Adema, SBN 149285
5                                                         HAHN & ADEMA
                                                          501 West Broadway, Suite 1730
6                                                         San Diego, California  92101-3595
                                                          Telephone:  (619) 235-2100
7                                                         Facsimile:  (619) 235-2101

8

9                                                         John M. Desmarais (admitted *pro hac vice*)
                                                          Robert A. Appleby (admitted *pro hac vice*)
                                                          Jeanne M. Heffernan (admitted *pro hac vice*)
10                                                        KIRKLAND & ELLIS LLP
                                                          153 East 53rd Street
11                                                        New York, New York  10022
                                                          Telephone:  (212) 446-4800
12                                                        Facsimile:  (212) 446-4900

13                                                        Attorneys for *Lucent Technologies Inc.*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28