1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Alison P. Adema, SBN 149285
HAHN & ADEMA
501 West Broadway, Suite 1600
San Diego, California 92101-3595
Telephone:     (619) 235-2100
Facsimile:     (619) 235-2101

*Attorneys for Lucent Technologies Inc.*

*Additional counsel listed on the last page*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

LUCENT TECHNOLOGIES INC.,

Plaintiff,

v.

GATEWAY, INC., GATEWAY COUNTRY
STORES LLC, GATEWAY COMPANIES,
INC., GATEWAY MANUFACTURING LLC
and COWABUNGA ENTERPRISES, INC.,

Defendants,

and

MICROSOFT CORPORATION,

Intervener.

MICROSOFT CORPORATION,

Plaintiff,

v.

LUCENT TECHNOLOGIES INC.,

Defendant.

LUCENT TECHNOLOGIES INC.,

Plaintiff,

v.

DELL INC.,

Defendant.

Case No. 02-CV-2060 B (CAB)
consolidated with
Case No. 03-CV-0699 B (CAB)
Case No. 03-CV-1108 B (CAB)

**LUCENT'S OPPOSITION TO
MICROSOFT'S MOTION FOR A NEW
TRIAL OR REMITTITUR ON THE
GROUP 2 AUDIO PATENTS**

Date:            July 25, 2007
Time:            9:00 A.M.
Courtroom:    2
Judge:          Hon. Rudi M. Brewster

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................1

II.     LEGAL STANDARD ..........................................................................................1

III.    ARGUMENT .......................................................................................................1

      A.      The Supreme Court's *KSR* Opinion Does Not Require A New Trial............................1

            1.      *KSR* Did Not Set A New Standard For Proof Of Obviousness,  But Rather Reaffirmed The *Graham* Analysis. ......................................................2

            2.      The Jury Was Instructed In A Manner Consistent With *KSR*...........................4

            3.      Substantial Evidence Supports The Jury's Verdict Of Nonobviousness. ..........5

            4.      Microsoft Cannot Show A "Due Process" Right To "Do Its Case Over.".....................................................................................................6

      B.      The Jury's Verdict That Windows Media Player Infringes The '457 Patent Is Not Against The Clear Weight Of The Evidence. ...........................................8

      C.      The Jury's Verdict That The Claims Of The '938 Patent Do Not Embody "New Work" Is Not Against The Clear Weight Of The Evidence. ..............................9

      D.      Microsoft Fails To Show Any Legitimate Basis For Retrial of Damages. ...................9

            1.      The Jury's Damages Verdict Is Not Against The Clear Weight Of Evidence On The Commercial Value Of The Accused Features. ..................10

            2.      The Jury's Damages Verdict Is Not Against The Great Weight Of Evidence On The *Georgia-Pacific* Factors....................................................11

            3.      Microsoft's Complaints About The Royalty Base Do Not Warrant Retrial......................................................................................................14

      E.      The Jury's Damages Verdict Is Wholly Consistent With The Evidence Presented. ..........................................................................................................16

            1.      The Jury's Verdict Is Not Facially Inconsistent. ...........................................16

            2.      The Jury's Verdict Is Easily Reconciled With The Trial Record. ..................17

      F.      The *AT&T* Decision Does Not Require A New Trial. ...............................................19

      G.      The Jury's Award Of Damages Is Supported By The Evidence And Was Not Based on Passion Or Prejudice. .......................................................................21

H.    The Jury's Verdict That The Claims Of The '080 Patent Are Not  Invalid Is Not Against The Clear Weight Of The Evidence. ........................................22

I.    The Jury's Verdict That The Fast Encoder And CyberLink Encoder Infringe The Patents-In-Suit Is Not Against The Clear Weight Of The Evidence. ...................22

J.    The Jury's Verdict That Microsoft Contributes To The Infringement Of The '080 And '457 Patents Are Is Not Against The Clear Weight Of The Evidence. .......22

K.    This Court's Order Regarding The Scope Of Mr. Johnston's Testimony Provides No Basis For Retrial.........................................................................24

L.    The Court Properly Precluded The Testimony Of Restaino and DeVilliers. .............25

M.    The Court Properly Construed The Claims Of The '080 Patent.................................25

IV.    CONCLUSION.................................................................................................25

1

# TABLE OF AUTHORITIES

2

**Page**

3

## CASES

4

*Aldrich v. Thomson McKinnon Sec., Inc.*,
    756 F.2d 243 (2d. Cir. 1985)......................................................................................19

5

*Anderson's-Black Rock, Inc. v. Pavement Salvage Co.*,
6
    396 U.S. 57 (1969)........................................................................................................3

7

*Bose Corp. v. JBL, Inc.*,
    274 F.3d 1354 (Fed. Cir. 2001)................................................................................14

8

*Bridgestone Sports Co. v. Acushnet Co.*,
9
    No. 05-132-JJF, slip op. at 2 (D. Del. May 22, 2007) .............................................4

10

*C.R. Bard, Inc. v. M3Systems, Inc.*,
    120 F. Supp. 2d 1145 (N.D. Ill. 2000) ....................................................................20

11

*Crystal Semiconductor Corp. v. Tritech Microelecs. Int'l, Inc.*,
12
    246 F.3d 1336 (Fed. Cir. 2001)................................................................................15

13

*Cytologix v. Ventana Med. Sys., Inc.*,
    424 F.3d 1168 (Fed. Cir. 2005)..................................................................................8

14

*Del Rio Distrib., Inc. v. Adolph Coors Co.*,
15
    589 F.2d 176 (5th Cir. 1979) ......................................................................................8

16

*Faison v. Nationwide Mortgage Corp.*,
    839 F.2d 680 (D.C. Cir. 1988)..................................................................................19

17

*First Beverages, Inc. v. Royal Crown Cola Co.*,
18
    612 F.2d 1164 (9th Cir. 1980) ....................................................................................5

19

*Fonar Corp. v. Gen. Elec. Co.*,
    107 F.3d 1543 (Fed. Cir. 1997)................................................................................15

20

*Fuji Photo Film Co., Ltd. v. Jazz Photo Corp.*,
21
    394 F.3d 1368 (Fed. Cir. 2005)................................................................................15

22

*G.A. Thompson & Co. v. Partridge*,
    636 F.2d 945 (5th Cir. 1981) ....................................................................................19

23

*Gallick v. Baltimore & Ohio R.R. Co.*,
24
    372 U.S. 108 (1963)..................................................................................................17

25

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
    318 F. Supp. 116 (S.D.N.Y. 1970).................................................................... passim

26

*Geosearch, Inc. v. Howell Petroleum Corp.*,
27
    819 F.2d 521 (5th Cir. 1987) ....................................................................................17

28

# TABLE OF AUTHORITIES
### (continued)

Page

*Graham v. John Deere Co. of Kansas City,*
383 U.S. 1 (1966) ............................................................................................... passim

*Hangarter v. Provident Life & Accident Insurance Co.,*
373 F.3d 998 (9th Cir. 2004) ............................................................................... 1

*Hebert v. Lisle Corp.,*
99 F.3d 1109 (Fed. Cir. 1996) ............................................................................. 8

*Home Indem. Co. v. Lane Powell Moss & Miller,*
43 F.3d 1322 (9th Cir. 1995) ............................................................................... 18

*In re Hawaii Fed. Asbestos Cases,*
871 F.2d 891 (9th Cir. 1989) ............................................................................... 17

*Isogon Corp. v. Amdahl Corp.,*
No. 97 Civ. 6219(SAS), 1997 WL 759435 (S.D.N.Y. Dec. 10, 1997) ............... 16

*Johnson v. Paradise Valley Unified Sch. Dist.,*
251 F.3d 1222 (9th Cir. 2001) ............................................................................. 1

*KSR Int'l Co. v. Teleflex Inc.,*
127 S. Ct. 1727 (2007) ........................................................................................ passim

*Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.,*
___ F.3d ___, No. 06-1402, 2007 WL 1345333 (Fed. Cir. May 9, 2007) ............ 3

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League,*
791 F.2d 1356 (9th Cir. 1986) ............................................................................. 22

*Loughridge v. Chiles Power Supply Co.,*
431 F.3d 1268 (10th Cir. 2005) ........................................................................... 17

*Lucent Techs., Inc. v Newbridge Networks Corp.,*
Civil Action No. 97-347-JJF (D. Del. May 17, 2002) ......................................... 20

*Micro Chem., Inc. v. Lextron, Inc.,*
317 F.3d 1387 (Fed. Cir. 2001) ........................................................................... 9, 10

*Microsoft Corp. v. AT&T,*
127 S. Ct. 1746 (2007) ........................................................................................ 19, 20, 23

*Pavao v. Pagay,*
307 F.3d 915 (9th Cir. 2002) ............................................................................... 1

*Philips Elecs. N. Am. Corp. v. Contec Corp.,*
411 F. Supp. 2d 470 (D. Del. 2006) .................................................................... 23

*Refac Int'l, Ltd. v. IBM,*
790 F.2d 79 (Fed. Cir. 1986) ............................................................................... 16

# TABLE OF AUTHORITIES
## (continued)

Page

*Robert Tyler & Assocs. v. Environmental Dynamics, Inc.*,
    119 F.3d 17, 1997 WL 419426 (Fed. Cir. 1997) ........................................................18, 19, 20

*Sakraida v. AG Pro, Inc.*,
    425 U.S. 273 (1976)..................................................................................................................3

*Scott v. Ross*,
    140 F.3d 1275 (9th Cir. 1998) ...............................................................................................24

*Sensonics, Inc. v. Aerosonic Corp.*,
    81 F.3d 1566 (Fed. Cir. 1996)................................................................................................15

*Smith & Nephew, Inc. v. Arthrex, Inc.*,
    No. CV 04-29-MO, 2007 WL 1467228 (D. Or. May 17, 2007).................................................3

*Solomon v. Kimberly-Clark Corp.*,
    216 F.3d 1372 (Fed. Cir. 2000)..............................................................................................24

*Stuckey v. N. Propane Gas Co.*,
    874 F.2d 1563 (11th Cir. 1989) ..............................................................................................19

*Tec Air, Inc. v. Denso Mfg. Michigan Inc.*,
    192 F.3d 1353 (Fed. Cir. 1999)..............................................................................................14

*Technology Licensing Corp. v. Gennum Corp.*,
    No. C01-04204 RS, 2007 WL 1319528 (N.D. Cal. May 4, 2007) ............................................3

*Temple v. Synthes Corp.*,
    498 U.S. 5 (1990)...................................................................................................................16

*TI Group Auto. Sys. (N.A.), Inc. v. VDO N.A., L.L.C.*,
    375 F.3d 1126 (Fed. Cir. 2004)................................................................................................8

*United States v. Adams*,
    383 U.S. 39 (1966)...................................................................................................................3

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940)...........................................................................................................13, 21

*Upjohn Co. v. Syntro Corp.*,
    CIV A. No. 89-107-JJF, 1990 WL 79232 (D. Del. 1990) .........................................................16

*Water Techs. Corp. v. Calco, Ltd.*,
    850 F.2d 660 (Fed. Cir. 1988)................................................................................................15

*Witco Chem. Corp. v. Peachtree Door, Inc.*,
    787 F.2d 1545 (Fed. Cir. 1986)................................................................................................8

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
    259 F.3d 1101 (9th Cir. 2001) ...............................................................................................18

## TABLE OF AUTHORITIES
### (continued)

Page

*Zhang v. Am. Gem Seafoods, Inc.*,
339 F.3d 1020 (9th Cir. 2003) ............................................................................17

**STATUTES**

35 U.S.C. § 112 ¶ 2 .........................................................................................24

35 U.S.C. § 271(c) .....................................................................................22, 23

35 U.S.C. § 271(f).............................................................................................23

## I.   INTRODUCTION

Following a three-week trial, and days of careful deliberation, the jury returned a well-founded verdict holding Microsoft liable for infringing Lucent's audio-coding patents and awarding appropriate damages.  Microsoft now asks to "do its case over" simply because it does not like the result.  But because the verdict comports with the weight of the evidence and controlling law, Microsoft cannot demonstrate legitimate grounds for discarding the verdict and conducting a new trial.[1]

## II.   LEGAL STANDARD

The court plays a "limited role in reviewing a jury's factual findings." *Johnson v. Paradise Valley Unified Sch. Dist.,* 251 F.3d 1222, 1227 (9th Cir. 2001).  "When reviewing the record as a whole, the court must draw all reasonable inferences in favor of the nonmoving party, keeping in mind that credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Hangarter v. Provident Life & Accident Insurance Co.*, 373 F.3d 998, 1005 (9th Cir. 2004).  "A trial court may grant a new trial only if the verdict is against the clear weight of the evidence, and may not grant it simply because the court would have arrived at a different verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).

## III.   ARGUMENT

### A.     The Supreme Court's *KSR* Opinion Does Not Require A New Trial.

Microsoft first contends that *KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727 (2007) alone requires a new trial.  Contrary to Microsoft's implication, *KSR* did not redraft the obviousness law but merely eased the rigid requirement that a teaching, suggestion, or motivation to combine ("TSM") be shown as a prerequisite to a finding of obviousness.  That change in law has no impact here — in expectation of *KSR*, this Court had removed the TSM requirement from its jury instructions.  Moreover, the record fully supports the jury's verdict of nonobviousness under the traditional *Graham* standard approved by *KSR*.  Finally, because the parties tried this case in full

---

[1]  All citations to the trial transcript, Plaintiff's Exhibits ("PXs"), Defendants Exhibits ("DXs"), and Miscellaneous Exhibits ("MXs") refer to materials in the Appendix of Exhibits in Support of Lucent's Oppositions to Microsoft's Post-Trial Motions, filed concurrently herewith.

anticipation of *KSR*, Microsoft cannot demonstrate any prejudice justifying its request to "do its case over."

## 1. *KSR* Did Not Set A New Standard For Proof Of Obviousness, But Rather Reaffirmed The *Graham* Analysis.

On June 26, 2006 — over seven months before trial — the Supreme Court granted *certiorari* in *KSR Int'l Co. v. Teleflex Inc.*, 119 Fed. Appx. 282 (Fed. Cir. 2005) to address a narrow question: whether a claimed invention can be held obvious "in the absence of some proven 'teaching, suggestion or motivation' that would have led a person of ordinary skill in the art to combine the relevant prior art teachings in the manner claimed." (MX 13)  On April 30, 2007, the Court answered that question by "rejecting the rigid approach of the Court of Appeals" in applying the TSM test. *KSR Int'l Co. v. Teleflex, Inc.*, 127 S. Ct. 1727, 1739, 1741 (2007).  Although the Court found that the TSM test captured a "helpful insight" that can be considered — "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed invention does" — the Court held that the Federal Circuit had erred in transforming that insight into a rigid rule that limited the obviousness inquiry.  *Id.* at 1741.

Nothing in *KSR* suggests that the Supreme Court intended to redraft the law of obviousness. To the contrary, the Court expressly reaffirmed its long-standing *Graham* analysis:  "In *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966), the Court set out a framework for applying the statutory language of § 103. . . .  While the sequence of these questions might be reordered in any particular case, ***the [Graham] factors continue to define the inquiry that controls***."  *Id.* at 1734; *see also id.* at 1739, 1741.  The Court's rejection of the TSM test was not a departure from *Graham*, but rather an express recognition that the Federal Circuit's rigid application of the TSM requirement was inconsistent with *Graham's* "expansive and flexible approach."  *Id.* at 1739.

Nevertheless, Microsoft contends that the Supreme Court replaced the TSM test with other questions "required to be asked," namely "whether 'familiar elements' were combined with predictable results."  (Microsoft Br. at 2)  But while the Court noted that "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results," it offered this statement not as a separate, additional obvious inquiry but

1   rather as a summary of three of its cases decided after *Graham*. *See id.* at 1739-40 (discussing *United*
2   *States v. Adams*, 383 U.S. 39 (1966); *Anderson's-Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S.
3   57 (1969); and *Sakraida v. AG Pro, Inc.*, 425 U.S. 273 (1976)).[2]   The Court found the Federal
4   Circuit's application of the TSM test, which required a showing of "precise teachings directed to
5   specific subject matter of the challenged claim," to be inconsistent with these precedents. *Id.* at 1741.
6   The Court reviewed these cases to emphasize that obviousness is a "broad inquiry," not to limit that
7   inquiry with additional formalistic analysis. *Id.*

8        Indeed, the few courts that have since considered *KSR* have recognized that *KSR* merely
9   reaffirmed the traditional *Graham* analysis.  In *Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*, ___
10   F.3d ___, No. 06-1402, 2007 WL 1345333, at *4 (Fed. Cir. May 9, 2007) the Federal Circuit viewed
11   *KSR* as emphasizing that "[a]n obviousness determination is not the result of a rigid formula
12   disassociated from the consideration of the facts of a case," but rather requires the application of
13   "common sense."  The court in *Technology Licensing Corp. v. Gennum Corp.*, No. C01-04204 RS,
14   2007 WL 1319528, at *18 n.38 (N.D. Cal. May 4, 2007), concluded that "[*KSR* court rejected a 'rigid
15   approach' to evaluating obviousness and may have generally lowered the bar for alleged infringers
16   attempting to establish obviousness, but it reaffirmed that the factors identified in *Graham* control the
17   inquiry."  Similarly, the court in *Smith & Nephew, Inc. v. Arthrex, Inc.*, No. CV 04-29-MO, 2007 WL
18   1467228, at *12 n.6 (D. Or. May 17, 2007), observed that "the Supreme Court rejected the Federal
19   Circuit's 'rigid approach' to the 'teaching, suggestion, or motivation' ('TSM') test for obviousness,
20   instead reaffirming the more 'expansive and flexible' approach set out in *Graham*."  Indeed, the
21   *Smith & Nephew* court found *KSR* "not particularly relevant" where the analysis did not depend on

22

23

---

24   [2]  As the Court noted, "in *Sakraida v. AG Pro, Inc.*, 425 U.S. 273 (1976), the Court derived from the
     precedents the conclusion that when a patent "simply arranges old elements with each performing the
25   same function it had been known to perform' and yields no more than one would expect from such an
     arrangement, the combination is obvious," belying Microsoft's suggestion that *KSR* set forth a new
26   standard in this regard. *Id.* at 1740.  In any event, even if *KSR* set forth a new inquiry regarding "old
     elements . . . performing the same function," that inquiry would be wholly inapplicable here.  As
27   discussed in Section III.A.3, *infra*, the evidence was that no existing audio coder had used an absolute
     hearing threshold for any purpose, let alone in the arrangement claimed by the '080 patent.

28

application of the TSM test.  *Id.*  And, finally, the court in *Bridgestone Sports Co. v. Acushnet Co.*, No. 05-132-JJF, slip op. at 2 (D. Del. May 22, 2007) (*see* MX 20), barred a defendant from "advance[ing] new prior art and new obviousness combinations" based on its view that *KSR* merely "eased the burden . . . to prove obviousness by rejecting the Federal Circuit's 'rigid approach' to obviousness and gravitating to a more 'common sense' approach."

In sum, *KSR* did not break new ground, but rather simply reaffirmed the traditional obviousness inquiry that has been in place for decades.  Nothing in *KSR* establishes a new test for obviousness.  Nothing in *KSR* "dramatically alters the scope of prior art."  (Microsoft Br. at 2) Microsoft's arguments to the contrary should be disregarded.[3]

### 2. The Jury Was Instructed In A Manner Consistent With *KSR.*

While *KSR* rejected the Federal Circuit's rigid application of the TSM test, that ruling has ***no*** impact on the verdict — the jury was ***never*** instructed that it needed to find a teaching, suggestion, or motivation to combine, but rather was told to apply the traditional *Graham* analysis.  (MX 3 at 42-45) Microsoft first raised the issue of *KSR's* potential impact in a November 2006 motion.  (MX 14) Microsoft argued that because the Supreme Court might remove the TSM requirement, trial should be continued.  (*Id.* at 5)  This Court denied the motion, choosing instead to minimize any impact of a subsequent *KSR* ruling through appropriate jury instructions:

> THE COURT:  Here's the answer.  Here's the answer.  I would rather try them.  You know why?  Because I think that with the help of counsel, ***I can draft an obviousness instruction that will survive what the Supreme Court is going to do.***

(MX 7 at 79:24-80:3)  The Court therefore asked for instructions that "st[u]ck to the [obviousness] statute and the *Graham* case" and that did not require a teaching, suggestion, or motivation to combine as a prerequisite to a finding of obviousness.  (*Id.* at 85:23-86:4)  The Court noted that if its

---

[3]  Microsoft also argues that "*KSR* calls into question the very presumption of validity," as well as the clear-and-convincing burden of proof drawn from that presumption.  (Microsoft Br. at 4)  *KSR*, however, expressly declined to reach that issue.  *KSR*, 127 S. Ct. at 1745.  Moreover, *KSR* raised this point only concerning prior art not disclosed to the USPTO.  *Id.*  That situation is not present here. (2/6/07 Tr. at 162:11-164:1)

1  instruction was "compliant" with the Supreme Court's subsequent *KSR* ruling, no retrial would be

2  necessary; rather, the Federal Circuit would "probably affirm me." (*Id.* at 87:23-88:3)

3  After receiving proposed instructions from both parties, the Court issued two obviousness

4  instructions to the jury — Instructions Nos. 51 and 52. (MX 3 at 42-45) These two instructions —

5  which hewed to the *Graham* analysis expressly reaffirmed by the Supreme Court in *KSR* — directed

6  the jury to assess obviousness based on "all of the evidence" by (1) determining the scope and

7  content of the prior art, the differences between the claimed invention and the prior art, and the level

8  of skill in art; and (2) considering various secondary considerations. (*Id.*) And while Instruction No.

9  51 noted that the jury "may consider whether or not there was some motivation or suggestion for a

10  skilled person to make the combination covered by the patent claims," nothing in the instruction

11  required such a showing as a prerequisite to a finding of obviousness. (MX 3 at 43)

12  Tellingly, Microsoft fails to challenge these instructions. Nor could it. This Court's

13  obviousness instructions were wholly consistent with the Supreme Court's subsequent *KSR* ruling.

14  The instructions embraced the reaffirmed *Graham* analysis and captured the TSM test as the "helpful

15  insight" — rather than rigid rule — that it was originally intended to be. *See KSR*, 127 S. Ct. at 1741.

16  Accordingly, because the jury was instructed in a manner consistent with *KSR*, that ruling cannot

17  provide any legitimate basis for a new trial. *See, e.g., First Beverages, Inc. v. Royal Crown Cola Co.*,

18  612 F.2d 1164, 1168-71 (9th Cir. 1980) (denying motion for new trial where jury instructions

19  consistent with subsequent Supreme Court ruling).

20  ### 3.   Substantial Evidence Supports The Jury's Verdict Of Nonobviousness.

21  The evidentiary record also provides no basis for new trial. Both parties focused on whether

22  it would have been obvious to use an absolute hearing threshold with a masking threshold to

23  determine quantization step sizes in conjunction with a rate loop processor as required by claims 1

24  and 4. Lucent's expert, Dr. Jayant, expressly applied the *Graham* analysis in offering his opinion

25  that the claimed invention would not have been obvious to a person of skill in the art in the relevant

26  1986-88 time frame. (2/13/07 Tr. at 88:8-91:4) Jayant noted that while references to the absolute

27  hearing threshold appeared in psychoacoustic literature the absolute hearing threshold had not been

28  used in audio coders at that time. (*Id.* at 89:7-90:18) Jayant opined that it would not have been

1  obvious to a person of skill in the art to use an absolute hearing threshold in an audio coder, let alone

2  in the specific arrangement contemplated by the claims of the '080 patent.  (*Id*. at 90:7-18)  In his

3  view, Microsoft's contrary assertions were based entirely on hindsight.  (*Id*. at 87:12-88:4)

4       The jury also heard evidence that persons of ***extraordinary*** skill in the art — Drs.

5  Brandenburg and Schroeder — had not used absolute hearing thresholds in their work.  (2/6/07 Tr. at

6  92:7-24, 182:7-22, 184:3-13; 2/12/07 Tr. at 11:4-7)  Indeed, the jury learned that ***no*** existing audio

7  coder employed an absolute hearing threshold — not Brandenburg's OCF coder, nor Schroeder's

8  MSC coder, nor Dr. Krahe's ATC coder.  (2/6/07 Tr. at 10:11-12:10)  Brandenburg also admitted that

9  one skilled in the art at the time would not have believed that an absolute hearing threshold would be

10  useful.  (2/6/07 Tr. at 183:1-8, 184:1-13)  Finally, the jury considered Brandenburg's own patent

11  application — filed six years ***after*** the effective filing date of the '080 patent — that expressly

12  identified the use of an absolute hearing threshold as a "considerable advance" that had occurred in

13  "the last few years."  (2/6/07 Tr. at 186:2-188:11; PX 3173 at 1:24-32)  Based on this record, a jury

14  could reasonably conclude that the claimed inventions of the '080 patent were nonobvious.

15       Nothing in *KSR* disturbs that conclusion.  Contrary to Microsoft's assertion, the opinions that

16  Lucent's expert offered at trial were not "based on a rigid application of the motivation to combine

17  test."  (Microsoft Br. at 3)  In fact, it was ***Microsoft***, not Lucent, that injected the concept of a

18  motivation to combine into the record through its direct examination of Brandenburg.  (2/6/07 Tr. at

19  93:18-94:10)  And while Jayant rebutted that testimony, his analysis expressly relied on the *KSR*-

20  approved *Graham* factors.  (2/13/07 Tr. at 88:8-91:4)  At no time did Lucent or its witnesses suggest

21  a "teaching, suggestion, or motivation to combine" test to the jury, let alone tell the jury that meeting

22  such a test was a prerequisite to a finding of obviousness.  Simply put, the issue of obviousness was

23  fairly tried and Microsoft lost.  Because the jury's verdict is not against the great weight of the

24  evidence or inconsistent with *KSR*, no retrial is warranted.

25       **4.     Microsoft Cannot Show A "Due Process" Right To "Do Its Case Over."**

26       At bottom, Microsoft does not seriously challenge the fairness of the verdict, but rather

27  alleges a "'due process' right to redo its validity case" to find new prior art and assert new

28  obviousness theories.  But nothing in *KSR* supports this radical request.  Indeed, since the Court and

1   the parties knowingly tried this case without use of the rigid TSM test rejected by *KSR*, it was

2   incumbent on Microsoft to put forth its best case of invalidity under the more expansive *Graham*

3   standard.  Thus, Microsoft cannot demonstrate any right to "do its case over."

4          Microsoft knew from at least June 26, 2006 —the date the Supreme Court granted *certiorari*

5   in *KSR* — that the Supreme Court might remove the TSM test.  Had Microsoft believed that it could

6   proffer new prior art or additional obviousness contentions if not shackled with the TSM test, it had

7   every opportunity to do so:  Microsoft served expert reports on invalidity of the '080 patent over two

8   months ***after*** that date.  (MX 16; MX 17)  Nor can Microsoft claim it was unaware of the possibility

9   that the Supreme Court would repudiate the TSM test.  In its November 2006 motion for continuance,

10  Microsoft acknowledged its belief that the Court would reach that very result.  (MX 14 at 5)

11  Nowhere in its motion, however, did Microsoft suggest that removal of the TSM test would

12  necessitate additional prior-art searching or expert reports.

13         The Court declined Microsoft's request to stay the trial, but instead chose to instruct the jury

14  in a manner that would minimize the impact of a subsequent *KSR* ruling.  (Section III.A.2, *supra*)

15  Both Lucent and Microsoft submitted proposed jury instructions that removed a finding of a teaching,

16  suggestion, or motivation to combine as a prerequisite to a finding of obviousness.  (MX 4 at 71;

17  MX 5 at 55)  Instead, both parties proposed instructions that made analysis of a motivation to

18  combine merely a factor that the jury could consider.  (*Id.*)  The Court's ultimate instruction adopted

19  the same approach.  (MX 3 at 43)  Thus, Microsoft was on notice that the case would be tried under

20  the more "expansive and flexible" standard subsequently adopted by the Supreme Court.  Microsoft

21  accordingly had every incentive to introduce all evidence it could muster to meet that standard.

22         At no time before trial did Microsoft suggest that it needed to search for additional prior art or

23  serve new expert reports.  Instead, Microsoft went to trial, presenting an obviousness case on the '080

24  patent and foregoing one on the '457 patent.  The record belies any allegation that Microsoft's '080

25  obviousness case was unfairly limited — Microsoft proffered testimony from three experts

26  concerning each of the perceptual audio coding systems existing before the invention of the '080

27  patent.  (See Section III.A.3., s*upra*)  And while Microsoft now concedes that it had previously

28  "file[d] a motion for summary judgment that the '457 patent is invalid over the prior art . . . and its

1    experts [had] opined that the '457 patent is obvious in their reports" (Microsoft Br. at 4), Microsoft

2    deliberately chose not to present any invalidity defense to the '457 patent at trial.[4]

3              The case that Microsoft presented therefore was not based upon innocent reliance on outdated

4    law, but rather on strategic decisions that it made while fully cognizant of the more-expansive

5    obviousness standard ultimately adopted by *KSR*.  The Fifth Circuit in *Del Rio Distrib., Inc. v.*

6    *Adolph Coors Co.*, 589 F.2d 176, 178-79 (5th Cir. 1979) addressed a situation similar to that present

7    here.  In that case, the plaintiff pursued certain antitrust claims at trial — while abandoning others —

8    based on a *per se* theory supported by existing law, even though the Supreme Court had already

9    granted *certiorari* in a case that could result in repudiation of the *per se* standard.  *Id.* at 178-79.

10   After the Supreme Court issued its ruling adopting a new "rule of reason" standard, the plaintiff

11   requested a new trial on the claims it had abandoned.  *Id.*  The Court denied the request, noting that

12   the plaintiff had voluntarily waived these claims with knowledge that the Supreme Court might alter

13   the legal standard.  *Id.*  The same result is dictated here.  Microsoft not only knew that the Supreme

14   Court might abandon the TSM test, the jury was instructed with that result in mind.  Microsoft cannot

15   therefore claim surprise.  Its motion for a new trial should be denied.[5]

16      **B.    The Jury's Verdict That Windows Media Player Infringes The '457 Patent Is Not
                Against The Clear Weight Of The Evidence.**

17            In seeking a new trial to revisit the jury's determination that WMP-10's HQ Encoder infringes

18   the asserted claims of the '457 patent, Microsoft simply repeats the arguments that it raises in seeking

19   JMOL on the same issue.  As explained in Section III.A.1 of Lucent's Opposition To Microsoft's

22   [4]  The Court granted Lucent JMOL of no invalidity of the '457 patent.  (2/12/07 *In Limine* Hearing
     Tr. at 31:21-32:13)

24   [5]  Microsoft relies on a 1986 Federal Circuit decision — which ordered a new trial based on judicial
     coercion of the jury — to argue that the grant of a new trial on obviousness mandates a new trial on
25   infringement and damages as well.  *See Witco Chem. Corp. v. Peachtree Door, Inc.*, 787 F.2d 1545,
     1549 (Fed. Cir. 1986).  That is not the law.  *See Hebert v. Lisle Corp.*, 99 F.3d 1109, 1114 (Fed. Cir.
26   1996) (rejecting argument that "in order to assure that the patent claims are interpreted the same way
     for validity and infringement, validity must be retried if infringement is retried").  The Federal Circuit
27   has frequently ordered a new trial on validity but ***not*** infringement.  *See, e.g., Cytologix v. Ventana
     Med. Sys., Inc.*, 424 F.3d 1168 (Fed. Cir. 2005); *TI Group Auto. Sys. (N.A.), Inc. v. VDO N.A., L.L.C.*,
28   375 F.3d 1126 (Fed. Cir. 2004).

Motion For JMOL, the jury was presented with more than substantial evidence from which it reasonably found infringement.  Based on this record, Microsoft cannot demonstrate that the jury's verdict was against the clear weight of the evidence.

**C.   The Jury's Verdict That The Claims Of The '938 Patent Do Not Embody "New Work" Is Not Against The Clear Weight Of The Evidence.**

In seeking a new trial to revisit the jury's determination that no claim of the '938 patent incorporates work performed in or after April 1989, Microsoft repeats the arguments that it raised in seeking JMOL on the issue.  As explained in Section III.B of Lucent's Opposition To Microsoft's Motion For JMOL, the record contains ample proof that the subject matter claimed in the '938 patent was "Existing Technology" developed before April 1989.  As such, Microsoft cannot demonstrate that the verdict was against the clear weight of the evidence.

**D.   Microsoft Fails To Show Any Legitimate Basis For Retrial of Damages.**

Despite its complaints, Microsoft wholly fails to show that the jury's damages award is against the weight of the evidence, facially inconsistent, contrary to fact or law, or the product of passion or prejudice.  On the contrary, the three-week trial was "a classic example of competing experts" where "[e]ach side has the opportunity to present its damages theory," and "[t]he outcome of the case depended to a large extent . . . on which expert's analysis [the jury] believed."  *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1394 (Fed. Cir. 2001) (affirming denial of motion for new trial).

Supported by a *Georgia-Pacific* analysis and evidence regarding the parties' patent licensing policies, patent license agreements, and the commercial importance of the accused features, Lucent's licensing expert, Mr. Smith, testified that a reasonable royalty would be 0.5% of the fair market value of computer systems.  (2/1/07 Tr. at 135:8-25)  In view of the monumental scope of Microsoft's infringement, Lucent's accounting expert, Mr. Hoeberlein, testified that this royalty amounted to slightly over $1.5 billion.  (2/2/07 Tr. at 99:10-15)  In contrast, Microsoft offered opinion testimony of Brian Napper, who admittedly lacked Smith's licensing experience, Hoeberlein's accounting credentials, and who advocated positions in this case that were inconsistent with his prior testimony.  (2/12/07 Tr. at 123:19-124:7, 128:16-19, 147:16-149:24, 158:7-159:10, 172:7-23)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The verdict in this case was both clear and consistent with the trial record.  The jury awarded damages based on an 0.5% running royalty, precisely the rate sought by Lucent.  (MX 2 at 8-9)  Lucent's accounting expert testified that the 0.5% reasonable royalty rate applied to the base of average computer sales prices a rate of $5.64 per infringing product (regardless of whether one or both patents are infringed).  (2/2/07 Tr. at 88:2-11).  Multiplying that per-unit rate by the total number of infringing units sold (272,705,089) produces the jury's damages award of $1,538,056,702.  (2/2/07 Tr. at 88:2-11; DX 6099 at Ex. CC)  Microsoft even stipulated to the accuracy of the numbers on which the jury's verdict was based.  (2/2/07 Tr. at 69:24-70:20)

Microsoft's hodgepodge of complaints do not warrant retrial.  "The amount of damages based on a reasonable royalty is an issue of fact."  *Micro Chem.*, 317 F.3d at 1394.  "The defendants may not like the jury verdict, but it was the result of a fair trial, fairly fought."  *Id.* The Court should reject Microsoft's misguided request for a new trial, and enforce the jury's unambiguous decision to award Lucent 0.5% of the fair market value of infringing computer systems.

### 1. The Jury's Damages Verdict Is Not Against The Clear Weight Of Evidence On The Commercial Value Of The Accused Features.

Microsoft's allegation that the jury's verdict is against the clear weight of the evidence "since the accused features offered no benefits" is meritless.  (Microsoft Br. at 7)  Regarding the '080 patent, Microsoft bases its assertion that "neither Microsoft nor its customers receive any benefit" entirely on Dr. Strawn's testimony that *he personally* could not hear a difference between music encoded with and without pbThresholdQuiet.  (Microsoft Br. at 8)  Microsoft's reliance on this disputed "evidence" is flawed for a number of reasons.  First, the jury may have itself detected a difference in sound quality.  Second, Dr. Strawn admitted that he created a "difference file" and conceded that *there was in fact a difference* between music encoded with and without pbThresholdQuiet.  (2/8/07 Tr. at 134:2-14)  Third, as discussed below, Microsoft's own witnesses and customers provided unrebutted testimony that the accused MP3 features were commercially valuable.  *See* Section III.D.3, *infra*.  Finally, Strawn and other Microsoft witnesses confirmed that Microsoft included, and continues to include, pbThresholdQuiet in all of its Windows Media Players with MP3 capability.  (2/8/07 Tr. 134:2-14, 135:10-14; 2/7/07 Tr. at 72:8-15)

1        Regarding the '457 patent, Microsoft simply takes issue with the jury's findings of

2  infringement.  (MX 2 at 6)  But that verdict is supported by ample evidence.  (1/30/07 Tr. at 213:18-

3  23, 215:22-216:2, 238:14-28; 2/8/07 Tr. at 139:9-16, 144:3-24, 145:12-14; 2/13/07 Tr. at 46:7-18,

4  50:20-52:8, 52:22-58:3; DX 7049; DX 7050; DX 7051)  This evidence — especially when coupled

5  with evidence that Microsoft needed to provide MP3 capability to remain commercially viable —

6  fatally undermine Microsoft's assertion that "the accused features offered no benefits."

7          **2.**    **The Jury's Damages Verdict Is Not Against The Great Weight Of**
                       **Evidence On The *Georgia-Pacific* Factors.**

8

9              **a.**    **Microsoft Ignores The *Georgia-Pacific* Evidence Supporting The**
                       **Jury's Damages Verdict.**

10        Microsoft's factual allegation that the jury's verdict is against the great weight of the evidence

11  "in light of established MP3 patent licenses" is also meritless.  (Microsoft Br. at 8)  Focusing its

12  argument exclusively on a couple of its software licenses, Microsoft ignores the wealth of evidence

13  directly supporting the jury's damages verdict.  First, Microsoft disregards Lucent's general policy of

14  licensing its patents at a rate of 1% per patent of the fair market value of the infringing product plus a

15  royalty-free cross-license to the licensee's patents.  (2/1/07 Tr. at 153:7-156:16; 1/29/07 Tr. at

16  163:10-19; PX 1514; PX 3145; PX 1513; PX 3146)  Microsoft also disregards evidence that Lucent

17  would license its audio standards-related patents at a more favorable rate of 0.5%.  (2/1/07 Tr. at

18  156:22-158:19; PX 1515; PX 3147)  Indeed, Mr. Smith gave Microsoft the benefit of this more

19  favorable rate.  (2/1/07 Tr. at 156:22-158:19)

20        Microsoft also ignores Lucent's actual licenses.  For example, Microsoft disregards the

21  Lucent/Nel-Tech license, a unilateral (one-way) license where Lucent licensed ***just the '080 and '457***

22  ***patents at a running royalty rate of 1%***.  (2/1/07 Tr. at 161:1-162:21; PX 1532; PX 3148; PX 3149)

23  This evidence also confirms the reasonableness of the jury's 0.5% rate for both MP3 patents.

24        Furthermore, Microsoft disregards the information handling industry's adoption of a royalty

25  rate of 1% per patent as an industry standard.  (2/1/07 Tr. at 137:10-138:13, 153:7-22; PX 1505; PX

26  3144; PX 1559; PX 3143; PX 1660; PX 3142)  Microsoft even disregards its own patent licenses in

27  which it paid royalties considerably higher than those Mr. Napper opined on here as well as granted

28  cross-licenses to all of Microsoft's patents.  (PX 1534; PX 1535; PX 1536; PX 1537)  Finally,

Microsoft ignores the unrebutted evidence from its own witnesses and customers that the accused MP3 features were commercially important and that Microsoft's profitability in its OEM business was in the "high 80s."  (2/1/07 Tr. at 111:2-113:11; 2/1/07 Tr. at 13:19-14:13; 2/1/07 Tr. at 85:23-86:7; 2/1/07 Tr. at 72:23-74:10; 2/1/07 Tr. at 24:17-21)

### b.   Microsoft's Views On The Appropriate Weighting Of The Fraunhofer Software Licenses Do Not Compel A New Trial.

Microsoft directs the bulk of its argument to its apparent disagreement with the jury regarding the appropriate weighting of the Microsoft/Fraunhofer software licenses under *Georgia-Pacific* factor no. 2.  Microsoft's arguments regarding the appropriate weighting of those software licenses in the *Georgia-Pacific* analysis were rejected by the jury with good reason — Microsoft compares apples and oranges in comparing its *software* licenses with the *patent* license at issue here.

The Microsoft/Fraunhofer agreements are undeniably software licenses.  Not only are they entitled "Software License Agreements" (as opposed to Microsoft's appropriately entitled "Patent Cross-License Agreements"), but they are for the purchase of specific "software code Deliverables." (PX 34 at §§ 2.2, 4.1; *accord* PX 36 at § 2.2)  The limited patent rights conveyed are only ancillary to the use of the licensed software code ("to the extent necessary to exercise any license rights granted herein") and simply allow the purchaser to use the software code it purchased free of a patent infringement suit by Fraunhofer.  (2/2/07 Tr. at 6:20-16; 2/13/07 Tr. at 153:18-7)[6,7]

By contrast, the hypothetical negotiation under *Georgia-Pacific* is for a patent license, not a software license.  (2/13/07 Tr. at 149:19-23); *see Georgia-Pacific Corp. v. U.S. Plywood Corp*., 318 F. Supp. 116, 1120 (S.D.N.Y. 1970).  Microsoft's accused code was not purchased from Lucent —

---

[6]   The 1997 Microsoft/Fraunhofer software licenses expressly disclaims any warranty that the licensed software does not infringe third-party patents.  (PX 34 at §§ 8.1(c); *accord* 2/2/07 Tr. at 213:16-215:10)  The 2004 Microsoft/Fraunhofer software license expressly excludes Lucent's MP3 patents from its warranty of noninfringement.  (PX 36 at § 6.1; *accord* 2/2/07 Tr. at 240:13-241:16)

[7]   Contrary to Microsoft's characterization, Smith did not testify that "neither Microsoft nor its customers received any patent rights under [the Thomson/Fraunhofer] software licenses."  (Microsoft Br. at 11)  Rather, Smith disputed the scope of the rights received, explaining that they were ancillary to the use of the licensed software code and simply allowed the purchaser to use the specific software code it purchased.  (2/2/07 Tr. at 6:20-16; 2/13/07 Tr. at 153:18-7)

1    what Microsoft needed from Lucent is not a software license for particular Lucent program code, but

2    rather a patent license that would allow Microsoft to use Lucent's MP3 technology.[8]

3         After Napper opined that amounts Microsoft paid third parties for software code was relevant

4    to a hypothetical Lucent/Microsoft patent license (2/12/2007 Tr. at 93:3-7, 96:9-14, 96:20-23, 98:11-

5    16, 98:23-99:3), Smith explained in rebuttal why he believed Napper's comparison was faulty and

6    why he disagreed about the weight Mr. Napper gave those software licenses.  (2/13/07 Tr. at 149:4-

7    23, 150:25-151:24)  Although Microsoft now complains about Smith's testimony, Microsoft never

8    objected to it at trial.[9]  *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 239 (1940)

9    ("[C]ounsel for the defense cannot as a rule remain silent, interpose no objections, and after a verdict

10   has been returned seize for the first time on a the point that the comments to the jury were improper

11   and prejudicial.")  Finally, the Court properly instructed the jury on the determination of damages

12   including detailed instructions concerning all of the *Georgia-Pacific* factors.  (MX 3 at 52-55)

13        Microsoft's view that its Fraunhofer software licenses were "the best evidence of what

14   Microsoft and Lucent would have negotiated at the time of the hypothetical negotiation" was

15   disputed, and was rejected by the jury.  (Microsoft Br. at 11-12)  Instead, the jury found that the

16   evidence Microsoft disregarded — the parties' patent licensing policies, actual patent licenses,

17   industry standard rates, and the commercial importance of MP3 — deserved more weight than the

18   Microsoft/Fraunhofer software licenses.  No new trial is warranted.

19

20

21

22   ───────────────────

     [8]   The hypothetical patent license that is the subject of *Georgia-Pacific* properly addresses the
23   infringement at issue — Microsoft's use of Lucent's MP3 patents in Windows Media Player.
     Microsoft mischaracterizes Smith's testimony in suggesting otherwise.  Contrary to Microsoft's
24   characterization, Smith was contrasting a software license with a patent license, not two different
     patent licenses.  (2/13/07 Tr. at 149:4-23)
25
     [9]   Smith's distinction between a software license and a patent license was so basic that the Court
26   stated its willingness to provide an express instruction on that point in connection with the Group 3
     trial: "But when it comes time to settling instructions, ***I'll be willing to consider an instruction that***
27   ***points out the difference . . . between selling a CODEC or a piece of software and licensing a***
     ***whole patent***."  (MX 10 at 122:8-13)
28

### c. Microsoft's Views On The Significance Of The Sisvel Agreements Do Not Compel A New Trial.

Microsoft's arguments regarding the Sisvel agreements similarly reflect nothing more than disagreement on the appropriate weighting to be given to those agreements under just one of the 15 *Georgia-Pacific* factors (factor 2). The agreements contained a number of oddities: (i) they were executed on the eve of trial, (ii) the three agreements contained interrelated terms, (iii) Microsoft offered only one of the agreements as evidence, (iv) the agreements were limited in the rights they conveyed, and (v) the agreements contained "unique" terms. (DX 6715; 2/13/07 Tr. at 163:9-164:6) The jury could not only have reasonably disagreed with the weight Napper accorded to the Sisvel agreements, but it could also have reasonably rejected Napper's testimony as not credible.

### 3. Microsoft's Complaints About The Royalty Base Do Not Warrant Retrial.

#### a. Ample Evidence Exists That The Accused MP3 Features Drove Sales Of Computer Systems Under The Entire Market Value Rule.

Microsoft's complaint that "Lucent failed to provide *any* evidence" that the accused MP3 features drove sales of computer systems for purposes of the entire market value rule is meritless. (Microsoft Br. at 13) At trial, a parade of ***Microsoft's own witnesses and customers*** uniformly conceded that that MP3 capabilities were commercially necessary. (2/1/07 Tr. at 13:19-14:13, 72:23-74:10, 85:23-86:7, 111:2-113:11, 243:19-23) Microsoft press releases and other evidence similarly confirmed the commercial importance of the MP3 features of Windows Media Player and that computers could not be sold without them. (PX 1512; PX 1551)

Not only did Lucent present evidence on the commercial value of the accused MP3 features on this point, the Court expressly recognized that Microsoft offered "no rebuttal of the evidence" and that there was "not even a conflict of the evidence." (MX 11 at 13:8-12) Ample evidence therefore existed in the record to support application of the entire market value rule. *See Bose Corp. v. JBL, Inc.*, 274 F.3d 1354, 1361 (Fed. Cir. 2001) (affirming application of entire market value rule where patented invention "inextricably worked with other components . . . as a single functioning unit" and "increased demand for the products in which it was incorporated"); *Tec Air, Inc. v. Denso Mfg. Michigan Inc.*, 192 F.3d 1353, 1362 (Fed. Cir. 1999) (affirming application of entire market value rule in view of customer demand for patented feature); *Fonar Corp. v. Gen. Elec. Co.*, 107 F.3d 1543,

1552-53 (Fed. Cir. 1997) (affirming application of entire market value rule where infringer's literature emphasized patented feature).[10]

Microsoft's arguments fall far short of outweighing the evidence on MP3's commercial necessity. Microsoft's complaints that Lucent allegedly "failed to show that the HQ encoder works" and "failed to respond to Microsoft's evidence that the alleged AHT has no effect on music quality" are meritless and contrary to the jury's verdict. (Microsoft Br. at 14) Microsoft also quotes Smith out of context: Smith expressly testified that "I think they buy it [computer systems] because MP-3 technology is included." (2/2/07 Tr. at 17:12-21) Moreover, Microsoft's complaints about Zwik's testimony lack merit, as Zwik is just one of the many witnesses whose testimony supports application of the entire market value rule and Zwik's testimony that "there would be no demand or market for an operating system without Windows Media Player" supports application of that rule.

        **b.**        **Computer Systems Are What Infringe And Microsoft Is Jointly And Severally Liable For That Infringement.**

Microsoft focuses its discussion of the royalty base almost exclusively on the entire market value rule; however, there is also an independent legal basis for computer systems as the royalty base. The Federal Circuit has repeatedly held that "[a] party that induces or contributes to infringement is jointly and severally liable with the direct infringer for all general damages." *Crystal Semiconductor Corp. v. Tritech Microelecs. Int'l, Inc.,* 246 F.3d 1336, 1361 (Fed. Cir. 2001).[11]

Here, computer systems running software are the products that infringe the '080 and '457 patents-in-suit and the jury found that Microsoft induced and contributed to that infringement. (MX 2) Testimony established that it was Lucent's policy to license computer manufacturers like Dell and Gateway, and that Microsoft injected itself into those negotiations so that it could "stand in the stead"

---

[10]  Microsoft cites the Court's Group 4 order as an independent requirement on top of the entire market value rule, but the order itself makes clear that this language was used in the context of the entire market value rule. (MX 12) In any event, the unrebutted evidence shows that the accused computer systems were "commercially infeasible" without the accused MP3 features.

[11]  *Accord Fuji Photo Film Co., Ltd. v. Jazz Photo Corp.*, 394 F.3d 1368, 1372 n.3 (Fed. Cir. 2005); *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 669 (Fed. Cir. 1988); *Sensonics, Inc. v. Aerosonic Corp.,* 81 F.3d 1566, 1576 (Fed. Cir. 1996).

of its customers.   (2/1/07 Tr. at 43-44; 2/12/07 Tr. at 138-142; 2/13/07 Tr. at 159-161)  Even Microsoft concedes that "when Microsoft and Lucent sat down at the hypothetical negotiation, the parties would have been looking to negotiate a reasonable royalty that allowed Microsoft *and its customers* to use Lucent's MP3 patents in Windows Media Player."  (Microsoft Br. at 10; *accord* 2/12/07 Tr. at 141:25-142:4)  Against that backdrop, as Mr. Smith testified, there is no reason to expect Lucent to accept less from Microsoft than it would seek from the computer manufacturers directly.   Rather, consistent with Lucent's own licensing practices and Microsoft's liability as an indirect infringer, Lucent is entitled to collect the same royalty from Microsoft as from other jointly liable infringers such as Dell and Gateway — particularly given that Microsoft filed in this case in order to stand in the stead of its customers.  (MX 3 at 51)  Accordingly, there is ample basis for using the infringing computer systems as the royalty base.[12]

### E.      The Jury's Damages Verdict Is Wholly Consistent With The Evidence Presented.

#### 1.      The Jury's Verdict Is Not Facially Inconsistent.

Contrary to Microsoft's contention, the jury's verdict is not inconsistent on its face — rather, it is completely consistent with the evidence and argument presented at trial.  As Microsoft itself admits, the jury adopted Lucent's damages theories in full.  (Microsoft Br. at 17 ("In sum, the jury awarded Lucent the total amount that it requested, $1.53 billion."); *Id.* at 19 ("[T]he jury rewarded Lucent by giving Lucent every dime it asked for.")).  The jury decided upon a running royalty of 0.5% as the appropriate measure of damages — precisely the same running royalty rate proposed by Lucent's licensing expert.  (2/1/07 Tr. at 135:8-25).  Simple multiplication confirms that the jury used the $5.64 rate as the basis for its award.  Microsoft admitted Hoeberlein's exhibits to his expert report, identifying 272,705,089 infringing units.  (DX 6099 at Exhibit CC).  Multiplying those units

---

[12]  Microsoft's assertion that "'joint and several liability' does not apply because Lucent did not sue Dell or other OEMs in Group 2" is meritless.  (Microsoft Br. at 15)  *See Temple v. Synthes Corp.*, 498 U.S. 5, 7 (1990) ("It has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit."); *Refac Int'l, Ltd. v. IBM*, 790 F.2d 79, 81 (Fed. Cir. 1986) (direct infringer need not be party to action for contributory infringement); *Isogon Corp. v. Amdahl Corp.*, No. 97 Civ. 6219(SAS), 1997 WL 759435, at *3 (S.D.N.Y. Dec. 10, 1997); *Upjohn Co. v. Syntro Corp.*, CIV A. No. 89-107-JJF, 1990 WL 79232, at *5 (D. Del. 1990).

1   by $5.64 per unit yields the exact total damages amount awarded by the jury.  Thus, it is not

2   "impossible," as Microsoft claims, to definitively determine the basis for the jury's damages award.

3   Rather, the basis for that award is clear and a new trial is not warranted.  *See Geosearch, Inc. v.*

4   *Howell Petroleum Corp.*, 819 F.2d 521, 528 (5th Cir. 1987).

### 2.    The Jury's Verdict Is Easily Reconciled With The Trial Record.

6         The Seventh Amendment guarantees "no fact tried by a jury shall otherwise be re-examined

7   in any Court of the United States except according to the rules of the common law."  *Zhang v. Am.*

8   *Gem Seafoods, Inc.*, 339 F.3d 1020, 1038 (9th Cir. 2003).  Thus, the Court must accept any

9   reasonable interpretation of the jury's actions and reconcile the jury's findings with the record.  *Id.*

10  ("[T]he deference owed to jury verdicts under the Seventh Amendment requires that any reconcilable

11  verdict must stand.")  Accordingly, a court "must attempt to reconcile the jury's findings, by exegesis

12  if necessary," before ordering a new trial, since "it is the duty of the courts to attempt to harmonize

13  the answers, if it is possible under a fair reading of them."  *Gallick v. Baltimore & Ohio R.R. Co.*, 372

14  U.S. 108, 119 (1963); *see also Loughridge v. Chiles Power Supply Co.*, 431 F.3d 1268, 1283 (10th

15  Cir. 2005) ("If there is any reasonable view of the case which makes the answers consistent, the case

16  must be resolved in that way."); *In re Hawaii Fed. Asbestos Cases*, 871 F.2d 891, 894 (9th Cir. 1989)

17  (recognizing the duty of the court to reconcile the jury's verdict on any reasonable theory consistent

18  with the evidence).

19        Microsoft does not — and cannot — dispute that the verdict demonstrates the intent of the

20  jury to adopt and follow Lucent's damages theories in full.  First, Microsoft fully admits that the jury

21  gave Lucent all of the damages it sought and even admits that the jury did not adopt Microsoft's

22  damages model.  (Microsoft Br. at 17).  Thus, the only conclusion that can be reached from the

23  verdict is that the jury fully intended to award Lucent the damages it sought in accordance with the

24  evidence presented.  Because the jury's intent is clear from the verdict form, any alleged

25  inconsistencies in the verdict can be easily reconciled by the Court in accordance with the jury's

26  intent and the evidence presented at trial.  *See Geosearch*, 819 F.2d at 527 ("A federal district court

27

28

1  has latitude to handle special verdicts so as to give effect to the jury's intentions" and "must interpret

2  verdicts in the light of the instructions, evidence and other surrounding circumstances.").[13]

3        As detailed above, the jury's verdict demonstrates that the jury intended to award Lucent

4  $5.64 per infringing product, regardless of whether one or both patents is infringed.   This is

5  confirmed by the jury's award of a 0.5% running royalty for each patent, consistent with Smith's

6  testimony that Lucent and Microsoft would enter a license at a running royalty rate of 0.5% for the

7  use of the technology, and that the rate should not be further divided by the number of patents.

8  (2/1/06 Tr. at 166:6-25).   The jury could not, consistent with Lucent's damages expert's testimony,

9  have entered $1.53 billion for the '080 patent and $707 million for the '457 patent, as Microsoft now

10  contends.   Lucent's damages expert testified that under Lucent's damages model, Lucent would only

11  seek 0.5% per infringing product, regardless of the number of patents infringed.   Thus, the jury's

12  division of the total award in per-patent amounts was merely an accommodation for the form of the

13  Special Verdict and a result of the jury's intent to ***not*** over-award damages.[14,15]

14

15

16

---

17  [13] *See also Robert Tyler & Assocs. v. Environmental Dynamics, Inc.*, 119 F.3d 17, 1997 WL 419426,
    at *4-6 (Fed. Cir. 1997) (unpublished) (affirming district court's correction of errors on special

18  verdict form to conform to trial evidence; noting that "District courts are given broad discretion to
    deal with matters such as the meaning of an ambiguous verdict form, since district courts are

19  intimately involved with the mechanics of the jury trial process, matters that an appellate court views
    only through the thick filter of a cold record.   The district court in this case was in a position to assess

20  whether the verdict figures, if transposed, were sensible in light of the evidence and therefore could
    make an informed judgment as to the likelihood that the jurors made an error of transposition.   In the

21  circumstances of this case, we are not prepared to hold that the district court abused its discretion in
    dealing with the problem of the verdict form.").

22

23  [14]  Indeed, the Court recognized that the proper focus should not be on the division of the damages on
    a per-patent basis — this Court indicated that it did not matter how the jury allocated the damages per

24  patent.   (2/12/2007 In Chambers Tr. at 117:9-11 ("They'll separately award one for one and one for
    the other.   I don't care if they divide it 50/50 or 40/60.   I don't care.")).

25  [15]  Microsoft cannot be heard to complain about the form of the Special Verdict.   Microsoft was the
    party who demanded that the jury be asked a per-patent damages number.   *See Yeti by Molly, Ltd. v.*

26  *Deckers Outdoor Corp.*, 259 F.3d 1101, 1108-09 (9th Cir. 2001) (rejecting defendants contention of
    error in the special verdict form as waived where the defendant failed to raise them until after the jury

27  rendered its verdict and was discharged); *Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d
    1322, 1331 (9th Cir. 1995).

28

---

1    Moreover, reconciliation of the verdict by the Court consistent with the evidence presented at

2    trial will not reexamine any of the facts considered the jury, and is well within the Court's broad

3    discretion.[16]   The Court should uphold the jury's unambiguous finding that Lucent suffered damages

4    in the amount of $5.64 per infringing product for a total of $1.53 billion.   Ample evidence supports

5    that verdict and the verdict reflects no contrary intent.

6    ### F.    The *AT&T* Decision Does Not Require A New Trial.

7    Microsoft argues that the Supreme Court's ruling in *Microsoft Corp. v. AT&T*, 127 S. Ct.

8    1746 (2007), requires that the jury's verdict be set aside.   While *AT&T* did limit liability for foreign

9    activity under certain circumstances, Lucent disputes that *AT&T* negates Lucent's claim to damages

10   for Microsoft's foreign sales in its entirety.   Putting that aside, however, it is undisputed that *AT&T*

11   has absolutely *no* effect on Lucent's claim to damages for Microsoft's infringing U.S. sales.

12   Moreover, contrary to Microsoft's assertion, the unambiguous trial record enables precise

13   determination of the damages awarded for Microsoft's domestic infringement.

14   Both parties acknowledge that the jury adopted Hoeberlein's damages calculations, which

15   separated U.S. from export sales.   (PX 3128; PX 3136).   Microsoft did not dispute these numbers —

16   to the contrary, Microsoft stipulated to their accuracy.   (2/2/07 Tr. at 69:24-70:20) Under those

17   circumstances, the trial record readily permits the Court to identify the number of infringing units

18

19   ────────────────

20   [16]  *See, e.g., Robert Tyler & Assocs.*, 1997 WL 419426 at *4-6.   As additional examples, courts have
     consistently refused to grant a new trial where a losing party claims that the jury erroneously divided
21   the damages between joint tortfeasors in joint-and-several liability cases.   Recognizing that such
     confusion arises simply from the fact that the form of the special verdict invited the jury to answer
22   separately for each defendant, courts have uniformly rejected subsequent requests for a new trial and
     instead reconcile the verdict based on the trial record.   *See Stuckey v. N. Propane Gas Co.*, 874 F.2d
23   1563, 1571-74 (11th Cir. 1989) (upholding district court's adjustment of the verdict where the jury
     erroneously divided the total amount of joint-and-several damages among all of the defendants);
24   *Faison v. Nationwide Mortgage Corp.*, 839 F.2d 680, 687-88 (D.C. Cir. 1988); *Aldrich v. Thomson
     McKinnon Sec., Inc.*, 756 F.2d 243, 248 (2d. Cir. 1985) (finding that the jury response to special
25   interrogatories indicated intent to award a total sum of $175,000 for defendants joint and several
     liability rather than award of $87,500 against both and stating that the jury should have been asked
26   the amount of damages suffered); *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 963-64 (5th Cir.
     1981) ("The jury clearly misunderstood the court's instructions and divided the total damages by four
27   . . . .   That such an error occurred is so clear that it is not unlike a clerical error which the court can
     correct under Fed. R. Civ. P. 60(a).").

28

attributable to U.S. sales, and the jury's allocation of damages.  Accordingly, if this Court deems necessary to reduce the jury's award to only U.S. sales, this Court should reduce the award to $785,088,000, reflecting the amount expressly allocated to U.S. sales using the jury's finding of $5.64 per infringing unit and the number of U.S. infringing sales in evidence at trial.  (*See* PX 3128 (139.2 million net units sold in U.S.)).  No new trial is necessary.  *See C.R. Bard, Inc. v. M3 Systems, Inc.*, 120 F. Supp. 2d 1145, 1148 (N.D. Ill. 2000) ("[W]hen there is a way to separate damages from various activities, damages should be awarded, and no new trial is necessary."); *see also* MX 6, Order, *Lucent Techs., Inc. v Newbridge Networks Corp.*, Civil Action No. 97-347-JJF (D. Del. May 17, 2002) (holding that where the jury's verdict represented the exact amount of damages sought for infringing sales, the court can determine the jury's allocation of damages and adjust the verdict to exclude sums improperly included); *Robert Tyler & Assocs.*, 1997 WL 419426 at *4-6 (noting trial court's broad discretion to assess special verdict in light of trial record).

For the same reasons, this Court can identify and confirm the damages awarded by the jury for § 271(f) infringement of Lucent's method claims.  As discussed more fully in Lucent's opposition to Microsoft's motion for JMOL, the *AT&T* decision expressly declined to address application of § 271(f) to method claims, thereby leaving intact controlling Federal Circuit case law establishing both that § 271(f) applies to method claims, and that software can constitute a component of a patented invention, as the jury found here.  Based on the undisputed sales figures, 62.2 million units of Windows Media Player 10 were found to infringe the asserted method claims.  (PX 3130; 2/2/07 Tr. at 81:18-82:12)  Multiplying those units by $5.64 yields $350,808,000 in damages.[17]

Nor is a new trial necessary for alleged prejudice flowing from presentation of Microsoft's foreign sales.  First, Microsoft conclusorily claims prejudice by Lucent's alleged "emphasis" on Microsoft's revenue numbers, numbers allegedly doubled by inclusion of foreign sales.  At trial,

---

[17]   Although the jury also found infringement of WMP11, the parties only presented sales data through November 2005 — before WMP11 was introduced.  Accordingly, additional damages resulting from WMP11's infringement of Lucent's method claims — both domestic and export — must be determined through an accounting, as Lucent has already requested.

1   Microsoft never disputed (and could not reasonably dispute) that it received billions and billions of
2   dollars in revenue based on U.S. sales alone.   Thus, Lucent's references regarding Microsoft's
3   billions in revenue were not dependent on foreign sales.   Microsoft's second claim of prejudice —
4   that the inclusion of foreign revenue unfairly affected the jury's analysis of *Georgia-Pacific* factors
5   number 8 and 11 — is disingenuous.   Neither Lucent's nor Microsoft's expert relied on any
6   discussion of those two particular *Georgia-Pacific* factors.   Regardless, the sales numbers to which
7   Microsoft stipulated establishes that Microsoft sold over one hundred million infringing units ***in the***
8   ***U.S.*** during the damages period.   Thus, even setting foreign sales aside, ample evidence established
9   Microsoft's extensive use of the patented technology in its Windows Media Player and that
10  Microsoft's use was enormously commercially successful.[18]

11          **G.      The Jury's Award Of Damages Is Supported By The Evidence And Was Not**
                **Based on Passion Or Prejudice.**
12
13          Finally, Microsoft asserts that the verdict was based on passion and prejudice rather than
13  reason, fact, and law.   As an initial matter, because Microsoft never objected to Lucent's statements
14  at trial that it now complains "inflamed the jury to hate Microsoft," it cannot now seek a new trial.
15  *See Socony-Vacuum Oil Co.*, 310 U.S. at 239.   In any event, as discussed above, the jury's award of
16  damages is supported by the evidence presented at trial.   As Lucent's expert testified, the amount of
17  damages reflects the hundreds of millions of infringing products Microsoft sold; its magnitude is
18  driven by the enormous number of infringing sales.   (2/2/07 Tr. at 136:4-10).   The jury did not
19  arbitrarily choose a number in the billions — instead, the size of the jury's award is supported by
20  abundant evidence of applicable licensing and accounting principles, as well as the undisputed
21  number of infringing sales.   Microsoft cannot now complain as to the presentation of its revenues and
22  profitability to the jury just because those revenues and profits were large, where, as here, the trial
23  record fully supports the conclusion that those profits and revenues were derived from the use of

---

26  [18]   Although Microsoft also contends that *KSR* requires a new trial on damages because of *Georgia-
27  Pacific* factor 9, this argument is meritless.   As discussed in Section III.A.1, *supra, KSR* does not
    have the impact Microsoft suggests.   In any event, any attenuated effect *KSR* may have on a damages
28  analysis is irrelevant here where neither expert relied specifically on *Georgia-Pacific* factor 9.

Lucent's patented technology.  *See Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1360, 1366 (9th Cir. 1986).

**H.    The Jury's Verdict That The Claims Of The '080 Patent Are Not Invalid Is Not Against The Clear Weight Of The Evidence.**

In seeking a new trial to revisit the jury's determinations that the 1987 OCF paper fails to anticipate claim 4 of the '080 patent, and that the Low Bit Rate paper fails to anticipate any claim of the '080 patent, Microsoft simply refers to the arguments that it raised in seeking JMOL on the same issues.  As explained in Sections III.H and III.I of Lucent's Opposition To Microsoft's Motion For JMOL the weight of the evidence fully comports with the jury's verdict that Microsoft failed to prove its invalidity theories by clear and convincing evidence.

**I.    The Jury's Verdict That The Fast Encoder And CyberLink Encoder Infringe The Patents-In-Suit Is Not Against The Clear Weight Of The Evidence.**

In seeking a new trial to revisit the jury's determinations that the Fast Encoder of Windows Media Player and CyberLink Encoder infringe the patents-in-suit, Microsoft simply incorporates Sections III.E and III.F of its JMOL motion.  As explained in Sections III.J and III.K of Lucent's Opposition To Microsoft's Motion For JMOL, the jury was presented with more than substantial evidence from which it reasonably found infringement.  Based on this record, Microsoft cannot demonstrate that the jury's verdict was against the clear weight of the evidence.

**J.    The Jury's Verdict That Microsoft Contributes To The Infringement Of The '080 And '457 Patents Are Is Not Against The Clear Weight Of The Evidence.**

The jury's verdicts that Microsoft contributes to the infringement of the patents-in-suit are not against the clear weight of the evidence.  In rendering its contributory-infringement verdicts, the jury necessarily found that each accused MP3 codec was not a staple article suitable for substantial non-infringing use.  (MX 3 at 27; *see also* 35 U.S.C. § 271(c))  Lucent elicited uncontroverted evidence that supports the jury verdicts:  *e.g.*, testimony that computer manufacturers install the accused MP3 codecs into the computers that they sell, that there is no other use for those MP3 codecs, and that operation of those MP3 codecs on such computers necessarily infringes.  (*See, e.g.,* 1/30/07 Tr. at 126-27)  Thus, Microsoft's motion for a new trial is not supported by evidence showing that any accused MP3 codec has any substantial noninfringing use.

Attempting to divert this Court's attention from this fact, Microsoft notes that Windows Media Player and Microsoft Windows incorporate other non-related, software functionalities that do not infringe Lucent's patents.  (Microsoft Br. at 21)  But it would "violate the 'logic of the patent laws' to allow [Microsoft] to avoid liability for contributory infringement by simply adding . . . noninfringing function[s] to" a product that practices the patents-in-suit.  *Philips Elecs. N. Am. Corp. v. Contec Corp.*, 411 F. Supp. 2d 470, 476 (D. Del. 2006).  As such, Microsoft cannot contend that the accused MP3 codecs have substantial noninfringing uses on the basis of their being packaged in a product that contains "separate and separable methods of programming . . . , only [some] of which infringe[]" Lucent's patents.  *See id.* at 476-77 & nn. 5-6.  Accordingly, because the accused MP3 codecs incorporated into Windows Media Player have no substantial noninfringing uses, Microsoft is not entitled to a new trial on contributory infringement.

Nor is Microsoft entitled to a new trial based on *AT&T*.  Even if the Supreme Court's *AT&T* decision held that software could never constitute a "component" under § 271(f), which it expressly does not, the Court's interpretation of "component" in § 271(f) in that case does not control the interpretation of "component" in § 271(c).  Contrary to Microsoft's assertions that the *AT&T* decision implicitly modified the extent of contributory infringement under 35 U.S.C. § 271(c), (Microsoft Br. at 21), the Supreme Court repeatedly restricted its holding in *AT&T* to considerations of whether the software in question qualified as a "'component' under § 271(f)" and refrained from any discussion of § 271(c).  *See, e.g., AT&T* at 7-9, 12.  Not only does the opinion fail to engage in any analysis of § 271(c), but the Supreme Court's interpretation of "component" in § 271(f) depends on the "combination" language in that section — language that is entirely absent from § 271(c).  *See, e.g., id.* at 2 ("The provision [§ 271(f)] thus applies only to 'such components' ***as are combined*** to form the "patented invention" at issue.").  Furthermore, even if the court were to extend the interpretation of "component" in § 271(f) to § 271(c), which it should not do for the reasons stated above, a reasonable jury could still find that Microsoft contributorily infringes both patents-in-suit because under § 271(c), both the accused software itself and Microsoft's "golden master" disks with that software also constitute "a material or apparatus for use in practicing a patented process."

### K.    This Court's Order Regarding The Scope Of Mr. Johnston's Testimony Provides No Basis For Retrial.

Mischaracterizing this Court's *in limine* ruling, Microsoft asserts that it was precluded from offering any testimony relating to the alleged invalidity of the '080 patent.  But the Court merely precluded Microsoft from eliciting from Mr. Johnston opinion testimony on the ultimate issue of invalidity and regarding the meaning of claim terms that have already been construed by the Court. Microsoft conceded that it did not disclose Johnston as an expert witness, as required by Fed. R. Civ. P. 26(a)(2), and "an inventor is not competent to construe patent claims." *Solomon v. Kimberly-Clark Corp.*, 216 F.3d 1372, 1380 (Fed. Cir. 2000).

Microsoft's claim that it was precluded from offering testimony regarding invalidity is belied by the fact that Johnston's testimony was directed largely to that issue.  Microsoft elicited testimony from Johnston regarding his work with Mr. Ferreira, in an attempt to prove its theory that Ferreira was an unnamed co-inventor.  (2/5/07 Tr. at 28:25-29:24, 32:12-33:3)  Microsoft also elicited testimony regarding Johnston's reissue declaration in an attempt to demonstrate that the reissue oath — and by extension the '080 patent — was invalid.  (*Id.* at 59:9-65:1, 84:15-88:12).  Indeed, when Lucent objected to that testimony, the Court clarified that it was not precluding Microsoft from offering testimony regarding the invalidity of Johnston's patents.  (2/5/07 Tr. at 70:3-5)  Rather, the Court explained that it would not permit Johnston to testify as to those areas that are precluded by *Solomon*, 216 F.3d at 1380, *i.e.*, invalidity under 35 U.S.C. § 112 ¶ 2 and claim-construction issues. (2/5/07 Tr. at 83:13-19)

Moreover, Microsoft cannot show prejudice based on the putative testimony that it now contends it would have elicited.  For example, Johnston's declaration is directed either to issues that Mr. Johnston actually testified about at trial (*e.g.*, Ferreira and the history of the field of audio coding, including prior art), to claim construction (*e.g.*, how the claims should be read in light of the prior art), or to expert opinion testimony on invalidity.  If Microsoft had additional testimony to offer, it should have made an offer of proof.  Indeed, Microsoft's failure to make any offer of proof as to Johnston's anticipated testimony at trial precludes Microsoft from crying foul now.  *Scott v. Ross*, 140 F.3d 1275, 1285 (9th Cir. 1998).

### L.      The Court Properly Precluded The Testimony Of Restaino and DeVilliers.

Although Microsoft complains that it was not permitted to offer the testimony of Mr. Restaino and Mr. DeVilliers, Microsoft never explains how either witness' testimony was relevant to any issue to be decided by the jury.  Microsoft contends that such testimony would have been relevant to the interpretation of the 1989 AT&T/Fraunhofer agreement, but the jury was neither asked nor required to interpret that agreement.  Moreover, neither Restaino nor DeVilliers had firsthand knowledge of the agreement.  To the contrary, Restaino testified during his deposition that he did not draft and was not involved in any of the negotiations that led to the 1989 AT&T/Fraunhofer agreement.  In fact, he testified that other than privileged communications (relating to a later 1997 agreement between AT&T and Fraunhofer after AT&T divested Lucent), he knew nothing about this agreement other than what the agreement itself says.  (MX 18 at 248:11-249:5)  Because the proffered testimony was irrelevant and incompetent, the Court properly precluded it.

### M.      The Court Properly Construed The Claims Of The '080 Patent.

As a last-ditch effort to secure a new trial, Microsoft argues that it was prejudiced by the Court's construction of the '080 patent claims.  But Microsoft does nothing other than repeat the same unsuccessful arguments it advanced during this Court's *Markman* hearings.  (Microsoft Br. at 24-25)  Indeed, during those hearings, the Court thoughtfully considered and rejected Microsoft's argument that the absolute hearing and masking thresholds must be used "within the iterative process of the rate loop processor."  (MX 19 at 10:24-11:3, 113:4-7)  Microsoft offers no reason for the Court to revisit its construction, conceding that it has already presented all relevant arguments in its *Markman* brief and at the *Markman* hearings.

## IV.      CONCLUSION

For the foregoing reasons, Lucent respectfully requests that the Court deny Microsoft's motion for a new trial.

1 DATED: June 1, 2007       BY_____s/Alison P. Adema_____

2                  John M. Desmarais (admitted *pro hac vice*)
                  Robert A. Appleby (admitted *pro hac vice*)

3                  KIRKLAND & ELLIS LLP

4                  153 East 53rd Street
                  New York, New York 10022

5                  Telephone:  (212)446-4800
                  Facsimile:  (212)446-4900

6

7                  Alison P. Adema, SBN 149285
                  HAHN & ADEMA

8                  501 West Broadway, Suite 1600
                  San Diego, California 92101-3595

9                  Telephone:  (619) 235-2100
                  Facsimile:  (619) 235-2101

10

11                 Attorneys for *Lucent Technologies Inc.*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28