**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LUCENT TECHNOLOGIES, INC., MULTIMEDIA PATENT TRUST., *et al.*,<br><br>      **Plaintiffs & Counter-Defendants,**<br><br>      **vs.**<br><br>GATEWAY, INC, et al.,<br><br>    **Defendants and Counter-Claimants,**<br><br>and<br><br>MICROSOFT CORPORATION,<br>     **Intervenor and Counter-Claimant,**<br>―――――――――――――――――――<br>**AND CONSOLIDATED CASES** | CIV. NO. 02-2060-B (CAB)<br>consolidated with<br>Civil No: 03CV0699-B (CAB) and<br>Civil No: 03CV1108-B (CAB)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PARTIES' MOTIONS FOR SUMMARY JUDGMENT REGARDING DEFENDANTS' AFFIRMATIVE DEFENSES AND COUNTERCLAIMS PERTAINING TO THE TRANSFER OF THE GROUP 1 PATENTS TO THE MULTIMEDIA PATENT TRUST**<br><br>**[Docket Nos. 1980, 1981, & 1992]** |

## I.    INTRODUCTION

The parties – Plaintiffs Lucent and Multimedia Patent Trust ("MPT") and Defendants Microsoft, Dell, and Gateway – have filed cross-motions for summary judgment on Defendants' affirmative defenses and counterclaims regarding the transfer of two patents in Group 1, U.S. Patent Nos. 4,958,226 and 4,383,272, from Lucent to MPT. The cross-motions concern the issues of license, unclean hands, and estoppel/implied license. In addition, Plaintiffs move for summary judgment on a number of affirmative defenses and

counterclaims specific to Gateway's pleadings:  (1) exhaustion; (2) breach of contract; (3) third party beneficiary breach of contract; (4) breach of good faith and fair dealing; (5) tortious interference with contract; (6) tortious interference with prospective economic advantage; (7) violation of the Sherman Act § 1; (8) violation of the Sherman Act § 2 – monopolization; (9) violation of the Sherman Act § 2 – attempted monopolization; and (10) patent misuse.

On motions orally made at the hearing on September 26, the Court ordered that *all* motions filed by any Defendant and Counter-Claimant shall be joined by all other Defendants and Counter-Claimants.  All orders concerning those motions shall apply to all Defendants and Counter-Claimants.

## II.    BACKGROUND

The MPEG-2 standard is an international standard for video data compression and data transport.  In 1997, a number of companies joined together in an agreement, entitled "Agreement Among Licensors" to create a pool of patents related to MPEG-2.  The companies covenanted to grant to the licensing administrator of the pool "a worldwide, nonexclusive, non-transferrable license or sublicense under all MPEG-2 Essential Patent(s)." (Dec. Blackburn Supp. Dell's Mot. (hereinafter "Blackburn Dec.") Ex. 10 §§ 2.2, 2.3.)   This covenant covered "all MPEG-2 Essential Patent(s) which the Party and its Affiliate(s) . . . presently or in the future, have the right to license or sublicense."  (Id. § 2.3.)  The licensing administrator was authorized to grant sublicenses to third parties.  (Id.)

At the time of the formation of the MPEG-2 pool (hereinafter "MPEG LA"), Lucent owned several patents which it and others deemed essential to the MPEG-2 standard. Lucent, however, chose not to join MPEG LA and instead pursued licensing of these patents through its own independent avenues.  Alcatel, although not an original member of MPEG LA, joined the pool of licensors in March 2003.  Defendants are sublicensees to MPEG LA. Dell joined in December 2001 (Blackburn Dec. Ex. 11.)  Gateway joined in January 2002 (Id. Ex. 20.)  Microsoft became a sublicensee of MPEG LA in February 2006.  (Id. Ex. 21.)

On April 2, 2006, Lucent and Alcatel entered into an Agreement and Plan of Merger.

(hereinafter "the Merger Agreement," Blackburn Dec. Ex. 2.)  This document contains numerous provisions, some of which address transferring assets, entering in contracts, and conduct in the ordinary course of business during the period before the two companies actually merged.  On September 7, 2006, shareholders of both companies voted and approved the Merger Agreement.  The merger took place on November 30, 2006; Lucent became a wholly owned subsidiary of Alcatel-Lucent.

Sometime in July 2006, while the merger plans were on-going, Lucent began strategizing as to the fate of its MPEG-2 related patents.  According to its in-house counsel, if the status quo was maintained, upon the merger Lucent's patents including U.S. Patent Nos. 4,958,226 and 4,383,272 (hereinafter collectively referred to as "the video coding patents") would be subject to Alcatel's commitment to MPEG LA.  After examining several options, in September 2006, Lucent's Chief Operating Officer Mr. D'Amelio gave the final approval to transfer the video coding patents into a trust.

Multimedia Patent Trust ("MPT" or alternatively, "the Trust"), was set up under Delaware law as an irrevocable Delaware Statutory Trust by an Agreement executed on November 21, 2006 (hereinafter "the Trust Agreement") and with a certificate of trust issued November 28, 2006.  (Marina Dec. Supp. Lucent's and MPT's Mot. Summ. J. (hereinafter "Marina Dec.") Ex. 10, 11.).  The structure of the Trust includes a trust advisor and three trustees – a licensing trustee, a litigation trustee, and an administrative trustee.  The beneficiaries of the Trust are Lucent Technologies Foundation (1% with a maximum of $100,000 in any year) and Lucent (the remainder).  A patent assignment agreement between Lucent and MPT ("the Patent Assignment"), which included the video coding patents, was executed on November 28, 2006, two days before the merger of Lucent and Alcatel.  (Id. Ex. 12.)

## III.    STANDARD OF LAW

Federal Rule of Civil Procedure 56(c) provides that summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that

1   the moving party is entitled to judgment as a matter of law."  In considering the motion, the

2   court must examine all the evidence in the light most favorable to the non-moving party.

3   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).  If the Court is unable to render

4   summary judgment upon an entire case and finds that a trial is necessary, it shall if

5   practicable grant summary adjudication for any issues as to which, standing alone, summary

6   judgment would be appropriate.  Fed. R. Civ. P. 56(d).

7        When the moving party does not bear the burden of proof, summary judgment is

8   warranted by demonstration of an absence of facts to support the non-moving party's case.

9   *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Summary judgment must be granted if

10  the party responding to the motion fails "to make a sufficient showing on an essential

11  element of her case with respect to which she has the burden of proof."  *Id.* at 323.

12  **IV.     ISSUES FOR SUMMARY ADJUDICATION**

13       **A.     License**

14       Defendants have raised the affirmative defense of license.  They assert a number of

15  theories under which they argue they are licensed under the agreement between Alcatel and

16  MPEG-LA: (1) ineffective assignment of the patents to MPT; (2) MPT is an "affiliate" under

17  the Agreement Among Licensors; and (3) MPT is the alter ego of Lucent.

18              **1.     Ineffective Assignment**

19       Defendants contend that the attempted transfer of the patents from Lucent to MPT was

20  ineffective such that the merged company Alcatel-Lucent retains sufficient rights to the video

21  coding patents to trigger its obligation to place the patents in the MPEG LA pool; Defendants

22  therefore contend that they have a license through their sublicensing agreements with MPEG

23  LA.

24       Defendants first assert that the Trust Agreement and the Patent Assignment fail to

25  transfer "all substantial rights" from Lucent to MPT, thereby rendering the transfer merely a

26  license, while the ownership of the patents remains with Lucent (and therefore Alcatel-

27  Lucent).  The labeling of a party as an owner, assignee, or a licensee of the patent is not

28  determinative in the assessment of the party's rights.  *Vaupel Textilmaschinen KG v.*

*Meccanica Euro Italia SPA*, 944 F.2d 870, 875 (Fed. Cir. 1991) (citing *Waterman v. Mackenzie*, 138 U.S. 252, 256 (1891)).  "To determine whether a provision in an agreement constitutes an assignment or a license, one must ascertain the intention of the parties and examine the substance of what was granted."  *Id.* at 874.

In the instant case, the Patent Assignment is couched in assignment language, transferring all rights from Lucent (Assignor) to MPT (Assignee): "Assignor . . . does hereby assign, convey, transfer and deliver to Assignee, its successors, assigns and legal representatives or nominees, Assignor's entire right, title and interest in and to the Trust Patents." (Marina Dec. Ex. 12 § 1; see also Id. Recitals ¶ C .)   Beyond these general recitations, the rights of the parties are more specifically delineated within the body of the Patent Assignment; this includes a recitation that the Patent Assignment is subject to the provisions of the Trust Agreement between these same two parties.  (Id. Recitals ¶ A, §10.)

The combination of these two agreements vests the majority of the rights with MPT. The Trust Agreement rests the exclusive power of granting licenses with MPT.  (Id. Ex. 10 § 5.1(a)(i).)   Although Lucent retains a world-wide nonexclusive license to the patents under the Patent Assignment, it has no rights to extend sublicenses to third parties.  (Id. Ex. 12 § 4.) Also according to the Trust Agreement, the Licencing Trustee of MPT has the power to enter into, administer and enforce licensing agreements without Lucent's consent.  (Id. Ex. 10 § 5.1(a)(i).)  Additionally, the Trust Agreement vests MPT with the sole power to initiate and control litigation on the patents.  (Id. § 5.1(b).)

One particular right is retained by Lucent:  MPT cannot assign the patents to a third party absent Lucent's consent.  This is expressly stated in the Patent Assignment: "The parties . . . intend that this Patent Assignment and/or any of the licenses granted hereunder not be assigned or transferred without the other party's express written consent."  (Id. Ex. 12 § 13.)  It is further detailed in the Trust Agreement:

> The Licensing Trustee shall also have the exclusive power to sell or otherwise monetize the Trust Patents owned by the Trust; provided, however that any such sale or monetization shall require the Company's prior written consent.

(Id. Ex. 10 § 5.1(a)(i).)

1    The absence of complete control over the transfer of property may be indicative of a

2    lack of true ownership.  *Propat Int'l Corp. v. RPost, Inc.*, 473 F.3d 1187, 1191 (Fed. Cir.

3    2007) ("The right to dispose of an asset is an important incident of ownership, and such a

4    restriction on that right is a strong indicator that the agreement does not grant [the transferee]

5    all substantial rights under the patent."); *Sicom Systems, Ltd. v. Agilent Technologies, Inc.*,

6    427 F.3d 971, 979 (Fed. Cir. 2005) ("Without a right to assign, the court need look no further

7    in determining that the licensor reserved substantial rights under the [a]greement.").

8    However, where a party does not have the unfettered right to assign, a finding that the party

9    lacks "all substantial rights" to the patent has generally involved circumstances where the

10   party lacks additional key rights, such as the right to initiate litigation independently, full

11   control of the sublicensing rights, legal title and/or the exclusive right to practice the patent.

12   *Propat*, 473 F.3d at 1191; *Sicom*, 427 F.3d at 978-80; *Intellectual Property Dev., Inc. v. TCI*

13   *Cablevision of Cal., Inc.*, 248 F.3d 1333, 1345 (Fed. Cir. 2001); *Abbott Labs. v. Diamedix*

14   *Corp.*, 47 F.3d 1128, 1132 (Fed. Cir. 1995).

15   Here, however, MPT lacks only the right to assign without Lucent's consent:  it

16   possesses complete control of the licensing and litigation rights on the patents.  This

17   circumstance is more in parallel with statements by the Federal Circuit in *Morrow v.*

18   *Microsoft Corp.*, Nos. 2006-1512, -1518, -1537, 2007 WL 2713248 (Fed Cir. Sept. 19,

19   2007).  There, the Court found that another's required consent to the transfer of a patent "is

20   not significantly restrictive" of "exclusionary rights" where the party holds other additional

21   key rights.  *Id.* at *8.  Therefore, based on the parallels to *Morrow*, the Court finds that here

22   the restriction on MPT's ability to assign the patents does not significantly impact MPT's

23   exclusionary rights; MPT possesses "all substantial rights" to the patents sufficient to

24   demonstrate an effective transfer of ownership from Lucent to MPT.

25   Moreover, even if MPT were not to possess sufficient rights to demonstrate

26   ownership, the transfer of the exclusive rights to license and sublicense the patents to MPT,

27   places these patents out of the reach of Alcatel-Lucent's obligations to MPEG-LA.  The

28   Agreement Among Licensors for MPEG LA reads in relevant part:

2.3     Each Party shall grant to the Licensing Administrator a worldwide, nonexclusive, non-transferrable license or sublicense **under all MPEG-2 Essential Patent(s) which the Party** and its Affiliate(s), if any, presently, or in the future, **have rights to license or sublicense** . . . .

(Blackburn Dec. Ex. 10 (emphasis added).)  Under the Trust Agreement and the Patent Assignment between Lucent and MPT, Lucent did not retain any rights to license or sublicense the patents.  (Marina Dec. Ex. 12 § 4.)  Thus, Alcatel-Lucent is not obligated by Section 2.3 of the Agreement Among Licensors.

Defendants argue that the obligation still stands, because according to the Patent Assignment, the transfer of rights to MPT is subject to "(a) existing rights and licenses (and associated obligations) of third parties, and Assignor's and its subsidiaries obligations to such third parties and (b) the license grant set forth in Section 4."  (Id. § 1.)  Defendants contend that Lucent was obligated to transfer the patents to Alcatel in the merger and hence, MPT's rights to the patents remain subject to this previous obligation.

In the Merger Agreement executed by Lucent and Alcatel in April 2006, Lucent coveted not to sell, transfer or license any material asset prior to the merger:

Lucent will not, and will not permit any of its Subsidiaries to sell, transfer, lease, license, pledge, encumber or otherwise dispose of any material (as determined with respect to Lucent and its Subsidiaries taken as a whole) assets or stock, other than (i) inventory, receivables and vendor financing loans in the ordinary course of business consistent with past practice and (ii) pursuant to existing contracts or commitments.

(Blackburn Ex.2 § 5.01(j).)

The video coding patents at issue here would be covered by this provision if they are "material assets."  The totality of the evidence indicates the patents fall into this classification.  The parties do not dispute that the two patents are essential to the MPEG-2 standard.  Plaintiffs claim that Dell sells all of its computers with DVD playback features incorporating the MPEG 2 standard and substantially all of Gateway's computers also incorporate this same technology.  (Blackburn Dec. Ex. 17, Expert Report of Roger S. Smith at 30.)   Additionally, Plaintiffs here are seeking as a reasonable royalty 0.5% of the fair market value or $1.50 on every infringing computer system sold by Defendants.  (Id. at 37.)

1  Lucent's Law Vice President-Intellectual Property and Intellectual Property Corporate

2  Counsel quoted Lucent's damages expert as estimating these damages to "range from $146

3  million to $1.43 billion against Microsoft; $64 to $491 million against Dell; and $30 to $126

4  million against Gateway." (Blackburn Dec. Ex. 1.)  Defendants have offered that these

5  damages are placed against Lucent's pre-merger value of $11.42 billion, a figure that

6  Plaintiffs have not disputed.  Finally, as detailed herein, Lucent has exerted significant effort

7  to place these patents out of the reach of MPEG LA's patent pool through its creation of

8  MPT.  This evidence overwhelmingly indicates that these assets are "material" with respect

9  to Lucent.  Therefore, Court finds that as a matter of law, no reasonable jury could find that

10  the two video coding patents at issue here do not constitute "material assets."

11      When Lucent transferred these material assets to MPT pre-merger, did it violate

12  Section 5.01(j) of the Merger Agreement?  Evidence offered by Defendants themselves

13  answers this question in the negative.  Defendants contend that Alcatel knew and participated

14  in the decision to transfer the patents from Lucent to MPT.  Defendants point to a series of

15  emails, memoranda, and presentations between Lucent and Alcatel discussing the problem

16  created by Alcatel's obligations to MPEG LA and strategies to avoid this obligation.  (Dec.

17  Marchese Supp. Microsoft's Opp. (hereinafter "Marchese Dec.") Ex. 25, Ex. 14 Dep.

18  Landmann 15-16, Ex. 26, Ex. 1, Ex. 3, Ex. 28, Ex. 4, Ex. 17; Blackburn Dec. Ex. 5, Ex. 1.)

19  Thus, from this evidence Defendants contend that Alcatel acknowledged and consented to

20  Lucent's actions, either by participating in the strategy-making or, at the very least, by not

21  taking any actions to stop Lucent from transferring the patents pre-merger.  This consent

22  exempts the transfer of the patents from the covenant in Section 5.01(j) of the Merger

23  Agreement; Lucent only covenanted not to transfer its material assets absent the consent of

24  Alcatel.  (Blackburn Dec. Ex. 2 § 5.01.)  Here, however, Alcatel gave its apparent consent to

25  a transfer of these particular material assets.

26      Defendants' attempts to escape this conclusion are unpersuasive.  Defendants point

27  only to Section 10.01 of the Merger Agreement which specifies the form and addressees for

28  written notices required between Lucent and Alcatel, and Section 10.03, specifying that any

waiver of a provision must be in a signed writing.  The Court finds that the notice provisions were substantially performed by the parties.  The communications included written emails and memoranda.  Although they were not sent to the addresses listed in Section 10.01, this section also permits communications to other parties "as such party may hereafter specify."  The emails were sent to the heads of departments and other key decision makers in both companies.  Finally, beyond the written communications, Alcatel's active participation in the decision to transfer the patents to MPT and its lack of any conduct or communications to suggest that it considered the transfer a violation of the pre-merger covenants, additionally indicate Alcatel's consent.  In addition, it should be reminded that Alcatel-Lucent became the 99% beneficiary of the trust property upon the merger.

Therefore, the Court finds that the divestiture of the two patents to MPT with Alcatel's consent was not a violation of the Merger Agreement.  Accordingly, the transfer of the patents from Lucent to MPT was effective.  MPT took these patents unfettered by any obligations to Alcatel.  Absent any such obligations, MPT has full control of the licensing rights to the patents; Alcatel has no rights to license or sublicense the patents.  Since Alcatel lacks these rights, it cannot provide them (and thus is not required to provide them) to MPEG LA under the Agreement Among Licensors.  Therefore, absent any such rights given to the MPEG LA pool, Defendants do not have a license to the patents on this basis.[1]

## 2.    MPT as an "Affiliate" of Alcatel-Lucent

As a second and independent basis for Defendants' license defense, Defendants contend that the patents are obligated to MPEG LA because MPT is an "affiliate" of Alcatel-Lucent.  Under the MPEG LA Agreement among Licensors, a party and its affiliates are obligated to grant MPEG LA a license to any MPEG-2 essential patents to which it presently has licensing rights or to which it obtains such in the future.  (Blackburn Dec. Ex. 10 §

---

[1] The Court also rejects Defendants' contention that the Merger Agreement provided Alcatel with control over Lucent's assets prior to the consummation of the merger on November 30, 2006.  While the Merger Agreement provides a host of conditions which were required to be satisfied pre-merger and a list of circumstances which could terminate the merger, (Blackburn Dec. Ex. 2 §§ 8, 9), these conditions do not indicate that assets or control of the assets would flow from one party to the other prior to the consummation of the merger.

2.3.)  An affiliate is defined by MPEG LA:

> Affiliate shall mean a corporation, company or other entity which now or hereinafter, directly or indirectly, controls, is controlled by or is under common control with a Party.  The term "control" as used in this Section 1.1 shall mean ownership of more than 50% of the outstanding shares representing the right to vote for directors or other managing officers of such corporation, company or other entity, or for a corporation, company or other entity which does not have outstanding shares, more than 50% of the ownership interest representing the right to make decisions for such corporation, company or other entity; provided, however, such corporation, company or other entity shall be deemed an Affiliate only so long as such "control" exists.

(Id. § 1.1.)

The definition of affiliate and hence the issue here focuses on the key word "control."  The Trust Agreement provides Lucent with substantial indirect control over MPT.  The Trust Agreement provides Lucent with the following powers:  (1) to grant or withhold consent to a sale of the Trust Patents; (2) to appoint successive trust advisors; (3) to remove each of the trustees with or without cause (no more than once per year); and (4) to renew or not renew the appointment of the Trust Advisor.  (Marina Dec. Ex. 10 §§ 4.3, 6.1(a), 6.1(c).)  In addition, Lucent had the power to appoint the initial Trust Advisor and the initial three trustees (litigation, licensing, and administrative).  These are all indirect powers over the trust; the direct decision making pertaining to the licensing and litigation over the trust property (the patents) rests exclusively with the trustees.  (Id. §§ 5.1(a)(i), (b).)

Defendants argue that Lucent's indirect control over MPT is sufficient to meet the definition of "affiliate" because Section 1.1 of the Agreement Among Licensors envisions indirect control.  Even so, the agreement is more specific; it defines "control"in two specific clauses.  The first does not fit with the situation here.  It pertains to entities with "outstanding shares."  MPT does not have any shares.

The second definition requires "more than 50% of the ownership interest representing the right to make decisions for such corporation, company or other entity."  Although Defendants argue that Lucent is a beneficial owner of  98% of the principal and 99% of the income (Marina Dec. Ex. 10 §§ 3.1, 3.2, 3.3), this ownership does not "represent the right to make decisions."  While it is true that Lucent has considerable indirect control of the trustees, it does not have "ownership" of the trustees.  Moreover, its power to exert this indirect

1    control does not come from its beneficial ownership of the trust property; instead, the powers

2    flow from Lucent's contractual rights under the Trust Agreement.  (Id. § 5.1; see also Del.

3    Code Ann. tit. 12, § 3806 (2007) providing that the affairs of a statutory trust are managed by

4    the trustees unless indicated otherwise by the governing instrument).  Defendants attempt to

5    argue that Lucent's beneficial ownership "represents the right to make decisions" because

6    Lucent can take court action against the trustees is unpersuasive.  While a beneficiary can act

7    to ensure the trustees perform their duties as required by the trust, this does not give the

8    beneficiary any power to participate in the decision-making by the trustee or to direct the

9    trustees to make any particular decisions.

10          Therefore, since neither definition of "control" is satisfied, the Court finds that MPT is

11   not an "affiliate" of Lucent (or Alcatel-Lucent) as defined in the Agreement Among

12   Licensors.  MPT is therefore not obligated to the Agreement Among Licensors and thus has

13   no obligation to license the patents to MPEG LA.  Absent such obligations, MPEG LA

14   cannot and does not provide Defendants with a license to the patents.

15                      **3.      MPT as an "Alter Ego" of Lucent**

16          Defendants offer a third basis as to why the patents are subject to the obligations of

17   Alcatel's agreements with MPEG LA.  Defendants contend that MPT is an alter ego of

18   Lucent and that the corporate veil of MPT should be pierced because Lucent and MPT are

19   one and the same.

20          Under Delaware law to pierce the corporate veil and demonstrate that one entity is the

21   alter ego of another, it must be shown that the other entity exerts "complete domination and

22   control."  *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d

23   1175, 1184 (Del. Ch. 1999).  "The degree of control required to pierce the veil is exclusive

24   domination and control . . . to the point that . . . [the dominated entity] no longer has legal or

25   independent significance of its own."  *Id*.  It must also be shown that the dominated entity is

26   "a sham and exist[s] for no other purpose than as a vehicle for fraud."  *Id*.

27          As a matter of law, this theory cannot succeed because the element of control is

28   lacking.  On this element, Defendants can only point to Lucent's power to make decisions on

1   the removal of the trustees, and the non-renewal and appointment of the trust advisor, as well

2   as Lucent's power to pay MPT's expenses.  Although this evidence demonstrates some

3   control by Lucent over MPT, as Defendants acknowledge throughout their briefings and as

4   discussed in detail herein, this control is only indirect.  Lucent has no direct input to the day-

5   to-day decisions pertaining to the licensing and litigation of the patents; these decisions are

6   the responsibilities of the trustees and trust advisor.  Thus, Defendants have by no means

7   offered any evidence that rises to the level of "exclusive domination" by Lucent such that

8   MPT has no "independent significance of its own."  Therefore, the Court finds that MPT is

9   not the alter ego of Lucent; thus, this basis cannot support Defendants' defense of license.

10        In sum, based on the above analyses, the Court finds that as a matter of law none of

11   the three bases offered by Defendants – ineffective transfer, affiliate status and alter ego –

12   provide a basis for the defense of license.  Accordingly, the Court **DENIES** Defendants'

13   motion for summary judgment and **GRANTS** Plaintiffs' motion on this defense.[2]

14        **B.**     **Unclean Hands**

15        The doctrine of unclean hands "closes the doors of a court of equity to one tainted

16   with inequitableness or bad faith relative to the matter in which he seeks relief, however

17   improper may have been the behavior of the defendant."  *Precision Instrument Mfg. Co. v.*

18   *Automotive Maint. Mach. Co.*, 324 U.S. 806, 814 (1945).  It requires that the party seeking

19   relief "have acted fairly and without fraud or deceit as to the controversy in issue."  *Id.*

20   Although courts are divided as to whether unclean hands applies to claims at law for money

21   damages, the doctrine has been applied in patent suits.  *See e.g.*, *Glaxo Inc. v. Novopharm*

22   *Ltd.*, 52 F.3d 1043, 1055 (Fed. Cir. 1995) (noting the endorsement of the Supreme Court for

23   application of unclean hands to patent suits as set forth in *Precision Instrument*, 324 U.S. at

24   816).  Generally, to demonstrate unclean hands there must be some misconduct such as fraud

25   underlying the relevant circumstances.  *See e.g.*, *Winbond Electronics Corp. v. International*

26   *Trade Com'n*, 262 F.3d 1363, 1372 (Fed. Cir. 2001) (misconduct before the U.S. Patent and

27

28        [2] Because the Court finds that Defendants do not have a license to the patents, the
Court need not and does not reach the issues of retroactivity and specificity to MPEG-2
products that such a license might confer.

1  Trademark Office); *Aptix Corp. v. Quickturn Design Systems, Inc.*, 269 F.3d 1369, 1374

2  (Fed. Cir. 2001) (litigation misconduct).

3       In the instant case, Defendants contend that Lucent's conduct with respect to the

4  transfer of the patents to MPT was fraudulent, or at least "sharp and unscrupulous" enough to

5  warrant the application of unclean hands.  They argue that the transfer of the patents was in

6  violation of state and federal laws and/or regulations and in violation of the Merger

7  Agreement between Lucent and Alcatel.  Defendants additionally contend that Lucent misled

8  the government, the public, and its shareholders as to the fate of its intellectual property in

9  the merger.

10       As to the violation of the Merger Agreement, this argument has been disposed above

11  regarding the license defense.  Because the patents were transferred with Alcatel's consent

12  and participation, there was no violation of the agreement.

13       Regarding Defendants' contention of misleading statements to governmental

14  organizations, they point to representations made by Lucent pre-merger that its intellectual

15  property, including its patents, would remain with the company and its subsidiaries.  Lucent

16  represented to the Securities and Exchange Commission ("SEC") in public filing on April 7,

17  2006:  "In fact, the way the proposed merger is structured, all of the patents will continue to

18  be owned by Lucent and its subsidiaries." (Blackburn Dec. Ex. 8 at LUC 1306135.)  Lucent

19  also represented to its shareholders in a publicly filed proxy statement on April 4, 2006,  that

20  "the 2 companies will combine their patent portfolio." (Marchese Dec. Ex. 19 at

21  LUC1305826.)  No evidence has been presented by either party that Lucent made any

22  attempt to correct these statements or to amend them to account for the transfer of a number

23  of patents to MPT in November 2006 before the merger.  In fact, Defendants have pointed to

24  evidence that Lucent and Alcatel strove to keep that information confidential even to the

25  point of limited distribution within the companies.  (Marchese Dec. Ex. 16, 17.)

26       Even accepting these circumstances without further question, Defendants have failed

27  to show why this conduct by Lucent offers the Defendants a basis for an unclean hands

28  defense here.  With respect to conduct affecting third parties, it is not so much who is harmed

1  directly but whether the equities between the instant litigants are affected by such conduct:

2      [Courts] apply the maxim requiring clean hands only where some
       unconscionable act of one coming for relief has immediate and necessary
3      relation to the equity that he seeks in respect of the matter in litigation. They do
       not close their doors because of plaintiff's misconduct, whatever its character,
4      that has no relation to anything involved in the suit, but only for such violations
       of conscience as in some measure affect the equitable relations between the
5      parties in respect of something brought before the court for adjudication.

6  *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245 (1933).  Defendants have

7  not shown that Lucent's conduct towards other parties, the government, and/or its

8  shareholders, had any effect on the issue of the instant litigation.  First, Defendants have not

9  offered any evidence that had the concerned government agencies, the SEC, the Federal

10 Trade Commission ("FTC"), and/or the Department of Justice ("DOJ"), been aware of the

11 misstatements, that they would have taken any different action with regard to the merger of

12 Lucent and Alcatel or, even if they had, that the fate of the patents would be any different

13 than it is now.  Second, Defendants have not offered any evidence that if Lucent had

14 amended its April statements to the SEC and/or shareholders to include the information of

15 the transfer to MPT that the circumstances of the merger and/or the patents would be any

16 different.  Third, Defendants not even offered any evidence that they have in any way

17 attempted to take any action to alert the SEC, FTC, or DOJ the Lucent's conduct, rather than

18 just capitalize on it here.  Fourth, after the merger of Alcatel-Lucent, the creation of MPT,

19 and the transfer of the patents became publicly known.  Defendants have offered no evidence

20 that this "change of events" from the pre-merger plans had any effect on the approvals of the

21 government agencies or Alcatel-Lucent shareholders.  Finally, Defendants have offered no

22 basis for their argument that had they known of Lucent's plans to transfer the patents,

23 Defendants would have moved to enjoin the transfer.[3]

24     In sum, Defendants have not offered any evidence that Lucent's conduct affected the

25 equities between the parties in the instant litigation.  Therefore, the Court **DENIES**

26 Defendants' motion for summary judgment and **GRANTS** Plaintiffs' motion for summary

27

28      [3] Defendants have failed to provide any legal basis on which they would have had
   standing to challenge Lucent's actions, let alone any valid basis on which to base an
   injunction.

02CV2060

1   judgment on this defense.

2          **C.**    **Cross-Motions Pertaining to Gateway's Counterclaims**[4]

3              **1.**    **Legal Estoppel**

4         "Legal estoppel refers to a narrow[] category of conduct encompassing scenarios

5   where a patentee has licensed or assigned a right, received consideration, and then sought to

6   derogate from the right granted." *Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d

7   1571, 1581 (Fed. Cir. 1997). "A patentee cannot sell his rights to another, and buy or obtain

8   control of an older patent, and, through such older patent, dispossess his assignee of the full

9   benefit of what he purchased." *AMP Inc. v. United States*, 389 F.2d 448, 452 (Ct. Cl. 1968).

10         Here, Gateway first argues that Alcatel has on one hand entered the MPEG LA pool

11   with its patents and yet, has obtained additional patents to this technology which it now

12   withholds by placing them with MPT. As Plaintiff points out, this contention has problems

13   with a confusion of entities. The only promise made to MPEG LA was made by Alcatel.

14   The patents, however, were first owned by Lucent and now by MPT. Neither Lucent nor

15   MPT has or had any obligations to MPEG LA. Hence, legal estoppel is inapplicable where

16   the first license and the subsequent rights withheld stem from the actions of two separate

17   parties.

18         Gateway's second argument contends that before the merger of Lucent and Alcatel

19   was finalized, Alcatel acquired the right to license the patents through the Merger

20   Agreement; thus, Alcatel concurrently held the rights to the patents and the obligations to

21   MPEG LA. This contention has already been rejected with respect to the licensing defense

22   and it is equally unsupported here. Prior to the actual consummation of the merger, the

23   Merger Agreement did not provide Alcatel with any rights to the patents; Alcatel therefore

24   did not concurrently hold the patents and its obligations to the MPEG LA pool.

25         Because the Court finds that as a matter of law, the doctrine of legal estoppel is

26   inapplicable, Gateway's motion for summary judgment is **DENIED** and Plaintiffs'

27   _____

28       [4]As noted in the introduction, *supra* page 2, the Court granted the oral joinder motions
of the co-defendants. For simplicity, the Court refers specifically to arguments by
"Gateway," but this Order applies to all Defendants and Counter-Claimants.

02CV2060

1    cross-motion is **GRANTED**.

2                    **2.    Equitable Estoppel**

3         Equitable estoppel requires three elements:  (1) "[t]he patentee . . .leads the alleged

4    infringer to reasonably infer that the patentee does not intend to enforce its patent against the

5    alleged infringer"; (2) "[t]he alleged infringer relies on that conduct"; and (3) "[d]ue to its

6    reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to

7    proceed with its claim."  *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020,

8    1028 (Fed. Cir.1992) (equitable estoppel).  "Equitable estoppel . . . focuses on 'misleading'

9    conduct suggesting that the patentee will not enforce patent rights.  *Wang*, 103 F.3d at 1581.

10        Gateway's defense fails on the element of reliance.  Although Gateway sets forth the

11   examples of Lucent's misleading statements to government agencies and shareholders (the

12   same as those for Defendants' unclean hands defense), Gateway fails to offer any evidence

13   that it relied on these statements or that it was materially prejudiced by any such reliance.

14   First, this suit concerns Gateway's alleged infringement beginning in 1998.  The statements

15   by Lucent occurred in mid-2006.  Thus, there can be no reliance between 1998 and mid-

16   2006.  Next, even after the issuance of the statements in April 2006, Gateway has not offered

17   any evidence that it saw Lucent's proxy statements or the SEC filings prior to the recent

18   discovery period for the instant litigation, yet alone relied on such statements.

19        Finally, Gateway argues, but fails to offer any evidence, that Alcatel induced Gateway

20   and the other Defendants to make and sell products that utilize MPEG 2 technologies.  This

21   last argument is unmeritorious for many reasons.  Alcatel is not a party here, and thus

22   Alcatel's conduct cannot provide a basis for equitable estoppel against MPT and/or Lucent.

23   Additionally, Defendants' alleged infringement began in 1998, but Alcatel did not even join

24   MPEG LA until 2003.  Furthermore, at the time when Defendants were making and selling

25   the technology prior to the commencement of this suit as well as the first four years of the

26   instant litigation, Lucent owned the patents.  Lucent had not made any representations that its

27   patents would be licensed through MPEG LA; to the contrary, Defendants such as Gateway

28   were informed that they would need a license directly from Lucent.  Moreover, the MPEG

1  LA sublicensee agreement explicitly warns that the MPEG LA pool does not necessarily

2  include all the patents necessary to practice the technology and that sublicensee signs the

3  agreement aware of such risks.  (Blackburn Dec. Ex. 20 §§ 4.2, 4.3.)

4       In sum, Gateway fails to offer any evidence that would raise an issue of fact on the

5  required elements of equitable estoppel.  Therefore, Gateway's motion for summary

6  judgment is **DENIED** and Plaintiff's cross-motion is **GRANTED**.

7       **D.**    **Plaintiffs' Motions Pertaining to Gateway's Counterclaims**

8            **1.**    **Unopposed Motions**

9       Plaintiffs move for summary judgment on Gateway's defenses of exhaustion and

10  breach of contract.  Gateway does not oppose either motion.  Although it is maintaining its

11  opposition to Plaintiffs' motion regarding its third party beneficiary counterclaim, Gateway

12  concedes that any claim for breach of contract is subsumed within this claim.  Under the

13  Federal Rules of Civil Procedure, if an adverse party does not respond to a motion for

14  summary adjudication, the Court may enter judgment against the adverse party if it is

15  appropriate.  Fed. R. Civ. P. 56(e).   Therefore, as to exhaustion and breach of contract,

16  Plaintiffs' motions are **GRANTED**.

17            **2.**    **Third Party Beneficiary**

18       Gateway's third party beneficiary counterclaim is predicated on the assertion that

19  Gateway is an intended beneficiary to the MPEG LA Agreement Among Licensors and as

20  such may bring a breach of contract claim against Lucent as a third party beneficiary.

21  Plaintiffs move for summary judgment on this counterclaim on two bases:  (1) Plaintiffs were

22  not a party to the contract; and (2) the contract expressly negates any third party beneficiary

23  rights.

24       With respect to the first ground, Gateway contends that after the merger of the two

25  companies, Alcatel-Lucent as an entity assumes all of the obligations under Alcatel's

26  agreements with MPEG LA.  As such, Alcatel-Lucent has an obligation to place the Group 1

27  video coding patents into the MPEG LA pool, and having failed to do so has breached the

28  contract with MPEG LA.

1    Contrary to Gateway's contentions, however, prior to the consummation of the merger

2    on November 30, 2006, Alcatel had no rights to license the patents.  Moreover, Lucent,

3    which had control of the patents before the merger, had no obligations to MPEG LA.

4    Therefore, before November 30, 2006, there cannot be any breach of contract to provide a

5    basis for this counterclaim.

6    Moreover, even after November 30, 2006, Gateway's third party beneficiary

7    counterclaim is barred by the explicit language of the contract at issue.  Although Gateway

8    contends that the sublicensees of the MPEG LA pool are intended beneficiaries to the

9    Agreement Among Licensors, Section 8.10 of the contract contradicts this contention:

10   "Nothing in this Agreement shall be construed to give rise to any obligation on any party

11   hereto for the benefit of a third party or to confer any rights on any third party." (Blackburn

12   Dec. Ex. 10.)

13   While Gateway argues that this literal provision should be disregarded, the applicable

14   law dictates otherwise.  The contract at issue falls under New York law based on its choice of

15   law provision.  (Id. § 8.9.)  New York law allows third party beneficiaries to sue for breach

16   of contract where the third party is an intended beneficiary but does not extend such rights to

17   incidental beneficiaries:

18    [G]enerally it has been held that the ordinary construction contract – i.e., one
     which does not expressly state that the intention of the contracting parties is to
19    benefit a third party-does not give third parties who contract with the promisee
     the right to enforce the latter's contract with another. Such third parties are
20    generally considered mere incidental beneficiaries.

21   Board of Managers of Riverview at College Point Condo. III v. Schorr Bros. Dev. Corp., 582

22   N.Y.S.2d 258, 259 (N.Y. App. Div. 1992) (quoting Portchester Elec. v. Atlas, 40 N.Y.2d

23   652, 656 (N.Y. App. Div. 1976)).

24   New York law also recognizes express disclaimers of third party beneficiaries.  "The

25   best evidence of whether contracting parties intended their contract to benefit third parties

26   remains the language of the contract itself. . . .  Where a provision exists in an agreement

27   expressly negating an intent to permit enforcement by third parties . . . that provision is

28   decisive."  Nepco Forged Products, Inc. v. Consolidated Edison Co. of New York, Inc., 470

1   N.Y.S.2d 680, 681 (N.Y. App. Div. 1984) (internal citations omitted); *see also Adelaide*

2   *Productions, Inc. v. BKN Intern. AG*, 834 N.Y.S.2d 3, 8 (N.Y. App. Div. 2007) (provision

3   expressly negating third party beneficiary controlling as a matter of law); *Board of Managers*

4   *of Alexandria Condo. v. Broadway/72nd Assocs.*, 729 N.Y.S.2d 16, 18 (N.Y. App. Div.

5   2001) (same).

6          Furthermore, Gateway has not met its burden to show that it was an intended

7   beneficiary, rather than simply an incidental beneficiary, of the Agreement Among

8   Licensors.  While it argues that the primary purpose of the agreement was to encourage

9   widespread adoption of the MPEG 2 standard, it points to no language in the contract which

10  would distinguish whether the primary purpose was to benefit the industry and sublicensees

11  like Gateway as opposed to its purpose as a tool to benefit the licensors for promoting

12  adoption of their technologies throughout the world.

13         Therefore, because Gateway has failed to meet its burden to show that it is an

14  intended beneficiary and because the "no third party beneficiaries" clause is controlling as a

15  matter of law, Plaintiffs' motion on this counterclaim is **GRANTED**.

16                    **3.       Breach of Good Faith and Fair Dealing**

17         Plaintiffs move for summary judgment to dismiss Gateway's counterclaim for breach

18  of good faith and fair dealing, arguing that without a contract between Lucent and Gateway,

19  this claim cannot be maintained.  To support this counterclaim, Gateway relies on its claim as

20  third party beneficiary coupled with the principle that all contracts under New York law

21  incorporate a covenant of good faith and fair dealing.  For the reasons explained above,

22  Gateway has not met its burden to show that it is an intended beneficiary under the

23  Agreement Among Licensors and thus it cannot show that Lucent and/or Alcatel owed

24  Gateway, at most an incidental beneficiary, a duty of good faith and fair dealing.  Therefore,

25  Plaintiffs' motion on this counterclaim is **GRANTED**.

26  / / /

27  / / /

28  / / /

1

2

### 4.  Tortious Interference with Contract and/or Prospective Economic Advantage[5]

3

Gateway predicates these two counterclaims on the contention that Lucent

4

intentionally interfered with its sublicense from MPEG LA when Lucent transferred the

5

patents to MPT.[6]

6

Claims for tortious interference require four elements:  (1) the existence of the

7

contract (or a prospective economic relationship); (2) interference which was intentional and

8

with malice; (3) the loss of the contract or prospective gain as a result of the interference; and

9

(4) damages.  *Velop, Inc. v. Kaplan*, 693 A.2d 917, 926 (N.J. Super. Ct. App. Div. 1997).

10

New Jersey law recognizes two distinct causes of action:  tortious interference with

11

performance of a contract and tortious interference with a prospective contract or economic

12

relationship.  *Printing Mart-Morristown v. Sharp Electronics Corp.*, 563 A.2d 31, 36 (N.J.

13

1989).  The former requires an enforceable contract where the latter does not.  *Id.*

14

Gateway's counterclaims rest on its asserted expectation that it would have received a

15

sublicense to the video coding patents upon the merger of Lucent and Alcatel pursuant to the

16

existing obligations between Alcatel and MPEG LA and the sublicensing agreement between

17

Gateway and MPEG LA.  This contention cannot support a claim for tortious interference

18

with contract.  The alleged interfering conduct by Lucent was the execution of the Trust

19

Agreement and the Patent Assignment; both were executed prior to November 30, 2006.

20

Prior to November 30, 2006, however, Lucent had no obligations to MPEG LA.  Thus, prior

21

22

[5] Although Microsoft has stated similar counterclaims, these were the subject of the very recent amendments.  As set forth in the Court's order September 14, 2007, Microsoft's summary judgment motions on these newly added counterclaims will not be addressed herein.

23

24

25

[6] The Court applies New Jersey law to these counterclaims based on the choice of law provisions of the court where the instant action commenced, Virginia.  *See Competitive Techs. v. Fujitsu Ltd.*, 286 F. Supp.2d 1118, 1157 (N.D. Cal. 2003) (citing *Ferens v. John Deere Co.*, 494 U.S. 516, 525 (1990) for the premise that cases transferred under 28 U.S.C. § 1404(a) fall under the choice of law provisions of the transferor court).  For torts, Virginia applies the law of "the place where the last event necessary to make an actor liable for an alleged tort takes place."  *Terry v. June*, 420 F. Supp.2d 493, 503 (W.D. Va. 2006) (citations and quotations omitted).  The agreements alleged to constitute the basis of the interference were executed in New Jersey.

26

27

28

1   to November 30, 2006, the sublicensee agreement between MPEG LA and Gateway did not

2   confer any rights to Lucent's patents.  Hence, Lucent's actions on November 28, 2006 did

3   not interfere with an existing contractual right held by Gateway.  Therefore, Plaintiffs'

4   motion for summary judgment on this counterclaim is **GRANTED**.

5         Rather than interference with an existing right, Gateway's contention more squarely

6   fits with a claim for tortious interference with a prospective economic relationship, a separate

7   cause of action.  This tort has been pleaded as a separate counterclaim by Gateway (and now

8   by all defendants).  To succeed on this cause of action, Gateway must demonstrate "a

9   reasonable expectation of economic advantage that was lost as a direct result of [Plaintiffs

10  and Counter-]defendants' malicious interference, and that it suffered losses thereby.

11  Causation is demonstrated where there is proof that if there had been no interference there

12  was a reasonable probability that the victim of the interference would have received the

13  anticipated economic benefit."  *Lamorte Burns & Co., Inc. v. Walters*, 770 A.2d 1158, 1170

14  (N.J. 2001) (citations and quotations omitted).

15        Here, Plaintiffs argue that Gateway could not have any reasonable expectation of

16  rights to the video coding patents because (1) Lucent always represented it would

17  independently license the patents and not join MPEG LA and (2) Lucent's counsel made

18  representations in this Court that the patents would not become part of the MPEG LA pool as

19  a result of the merger.  Plaintiffs' arguments do no more than raise questions of fact.  As

20  discussed with respect to other defenses and counterclaims herein, Lucent and Alcatel made

21  several public representations in the Agreement and Plan of Merger and the proxy materials

22  that suggested the merged company would hold all of Lucent's intellectual property and that

23  these properties would not be transferred pre-merger.  (Blackburn Dec. Ex. 2, 25.)

24  Additionally, the terms of the MPEG LA agreements, the Agreement Among Licensors, and

25  the sublicensee agreement between MPEG LA and Gateway, coupled with these statements

26  could provide a reasonable expectation that any patent rights obtained by Alcatel to MPEG-2

27  Essential Patents would flow into the MPEG LA pool.

28        Plaintiff also argues that Gateway is unable to demonstrate the element of malice.

02CV2060

"Malice is defined to mean that the harm was inflicted intentionally and without justification or excuse." *Printing Mart-Morristown*, 563 A.2d at 37. "The conduct must be both 'injurious and transgressive of generally accepted standards of common morality or of law.'" *Lamorte Burns*, 770 A.2d at 1170-71. A business-related reason may provide a justification where the motive, purpose, and means used can be justified by the alleged interfering party. *Id*. at 1171. However, "[t]he line clearly is drawn at conduct that is fraudulent, dishonest, or illegal." *Id*. at 1170.

Here, Lucent's arguments on the element of malice only serve to raise issues of fact. Although Lucent asserts that its conduct was legal and carried out for a legitimate business purpose to protect the value of the patents for its shareholders, these assertions are met by opposing contentions from Gateway regarding Lucent's employment of wrongful means to achieve its ends, including alleged violations of the Delaware Uniform Fraudulent Transfers Act and allegedly misleading statements made to the SEC, FTC, and DOJ. In light of these issues of fact as well as those pertaining to a reasonable expectation of rights, Plaintiffs' motion on this counterclaim is **DENIED**.

### 5.    Violation of the Sherman Act Section 1

Plaintiff moves for summary judgment on Gateway's Sherman Act Section 1 counterclaim, arguing that Gateway fails to provide evidence to demonstrate any of the required elements. A violation of Section 1 requires a showing of an agreement, combination, or conspiracy which unreasonably restrains interstate trade or commerce. *County of Tuolumne v. Sonora Cmty Hosp.*, 236 F.3d 1148, 1155 (9th Cir. 2001). A restraint on trade may be demonstrated as a *per se* violation or established under a rule of reason. Where the latter is invoked, as it is in the instant case, it must be demonstrated "that the conduct at issue actually caused injury to competition, beyond the impact on the claimant, within a field of commerce in which the claimant is engaged." *Metro Industries, Inc. v. Sammi Corp.*, 82 F.3d 839, 847 (9th Cir. 1996). Such a showing involves the demonstration that the violating parties have sufficient market power to significantly impair competition and "that the restraint has actually produced significant anti-competitive effects." *Id.* at 848.

1    On the first element, an agreement or conspiracy, Gateway points to the

2  communications between Lucent and Alcatel, prior to their merger pertaining to the fate of

3  the video coding patents.  While these communications do not explicitly spell out a plan of

4  action to avoid Alcatel's obligations to MPEG LA, they provide at least a reasonable

5  inference that the two companies were communicating plans of action and/or acting together

6  in making decisions on the fate of the patents.  This evidence is sufficient to raise a triable

7  issue of fact on this first element.

8    Regarding the showing of an unreasonable restraint on trade under a rule of reason,

9  Gateway must demonstrate market power of Lucent and MPT with regards to these patents

10  and injury to the particular field of commerce.  As to market power, Gateway has made only

11  a cursory showing, primarily consisting of attorney argument.  It contends that MPEG-2 is

12  ubiquitous in the relevant computer market and a license on the video coding patents would

13  be required for every MPEG-2 compliant product.  It does not substantiate this contention

14  with any evidence.  It provides no evidence as to how "ubiquitous" MPEG-2 technology is

15  within the market, nor does it substantiate the conclusion that there are no alternative ways to

16  provide the technology absent employing the patents.  The latter is likely a reasonable

17  inference since both parties admit that the video coding patents are "essential" to MPEG-2.

18  However, even accepting these contentions as true, Gateway's further assertion that Lucent

19  and/or MPT is exacting or could exact "supracompetitive" licensing fees is without any

20  support.  As such, all Gateway has shown is that Lucent and/or MPT hold a legal patent

21  monopoly.

22    Furthermore, Gateway has similarly failed to show any anti-competitive injury in the

23  relevant market.  It offers only speculation and attorney argument that if Lucent/MPT

24  withholds the patents, the efficiencies of the patent pool will deteriorate and participants in

25  the market will be paying double licensing fees to the pool and MPT.

26    In sum, Gateway has failed to meet its burden to demonstrate an issue of fact with

27  respect to the required element of an unreasonable restraint of trade.  Accordingly, Plaintiffs'

28  motion for summary judgment on this counterclaim is **GRANTED**.

02CV2060

1

**6.      Violation of the Sherman Act Section 2 – Monopolization**

2        "The offense of monopoly under § 2 of the Sherman Act has two elements:  (1) the

3    possession of monopoly power in the relevant market and (2) the willful acquisition or

4    maintenance of that power."  *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S.

5    451, 481 (1992).   Gateway fails to raise an issue of fact on either of these elements.

6        Monopoly power is "the power to control prices or exclude competition" in the

7    relevant market.  *Id*.  Gateway appears to argue that the relevant market is MPEG-2

8    compliant computers; however, it does not offer any evidence to support this assertion nor

9    does it offer any argument, let alone evidence that MPEG-2 technology does not have any

10   interchangeability with other technologies in the market.  *See United States v. E. I. du Pont*

11   *de Nemours & Co.*, 351 U.S. 377, 394 (1956) ("When a product is controlled by one interest,

12   without substitutes available in the market, there is monopoly power.").  In essence, other

13   than an assertion that Lucent/MPT own two MPEG-2 essential patents, Gateway has made

14   no showing on this element.[7]

15       Similarly, on the element of willful acquisition or maintenance of monopoly power,

16   Gateway has done no more than speculate.  It argues that Lucent willfully acquired

17   monopoly power by creating MPT and sheltering the patents from becoming part of the

18   MPEG LA pool.  This theory, however, neglects two key facts.  First, participation in the

19   MPEG LA pool is optional.  Although Alcatel entered the pool in 2003, it has the option to

20   withdraw.  (Blackburn Dec. Ex. 2 §7.2.)  Second, the control of the patents by MPT is no

21   different in the relevant market from the previous circumstances where Lucent owned the

22   same patents –  the patents were not entered into the MPEG LA pool but were only licensed

23   individually.  Gateway has offered no evidence to suggest that the transfer of the patents to

24   MPT has changed these circumstances.  Ownership and control of a patent without more is

25   not an unreasonable restraint on trade.  *See United States v. Westinghouse Elec. Corp.*, 648

26   F.2d 642, 647 (9th Cir. 1981) (noting that patents may create monopoly power but there must

27

28       [7]Simple ownership of a patent does not create a presumption of market power. *Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 31 (2006).

- 24 -

1   be something more to run afoul of antitrust laws such as procuring the patent by fraud,

2   extending the monopoly outside the patent grant such as through a tying arrangement with

3   unpatented products and/or acquiring all past and future patents relevant within a market).

4       In sum, Gateway has failed to meet its burden to demonstrate evidence in support of

5   the essential elements of its counterclaim for violation of the Sherman Act Section 2,

6   therefore, Plaintiffs' motion for summary judgment on this counterclaim is **GRANTED**.

7       **7.      Violation of the Sherman Act Section 2 – Attempted Monopolization**

8       The elements of attempted monopolization are:  "(1) that the defendant has engaged in

9   predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a

10  dangerous probability of achieving monopoly power."  *Spectrum Sports, Inc. v. McQuillan*,

11  506 U.S. 447, 456 (1993).  Plaintiffs argue that Gateway lacks evidence on each of these

12  essential elements.

13      Gateway again provides nothing other than cursory argument in its attempt to support

14  this counterclaim.  As to anticompetitive conduct, Gateway relies on its "showing" as to its

15  Section 1 counterclaim.  As explained therein, Gateway has made no such showing.

16  Gateway also relies on its Section 1 claim for a showing on a specific attempt to monopolize.

17  Again, this fails for the same reason – reasonable inferences must be based on facts and

18  evidence, not just speculation and attorney argument.  Finally, as to a dangerous probability

19  of achieving monopoly power, all Gateway offers is attorney argument that MPT's and

20  Lucent's control of the patents are "blocking" to the industry.  Even if such a theory could be

21  supported, Gateway has not proffered a single piece of evidence or expert opinion to

22  establish such a contention.  Speculation and attorney argument do not create issues of triable

23  fact to preclude summary judgment.  Plaintiffs' motion on this counterclaim is therefore

24  **GRANTED**.

25      **8.      Patent Misuse**

26      Patent misuse is an equitable defense and an extension of the unclean hands doctrine.

27  *Senza-Gel Corp. v. Seiffart*, 803 F.2d 661, 668 (Fed. Cir. 1986).  "Patent misuse is an

28  affirmative defense to an accusation of patent infringement, the successful assertion of which

requires that the alleged infringer show that the patentee has impermissibly broadened the 'physical or temporal scope' of the patent grant with anticompetitive effect." *Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 868 (Fed. Cir. 1997) (citations omitted).  A rule of reason analysis is applied:  "the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *Id*. at 869 (quoting *State Oil Co. v. Kahn*, 522 U.S. 3, 10 (1997)).

Here, Gateway's patent misuse counterclaim is predicated on Defendants' license defense, namely that Defendants have a license to the patents as sublicensees of MPEG LA based on the "incomplete" transfer of the patents to MPT and Alcatel's outstanding obligations to MPEG LA.  Because Defendants' license defense fails on this ground, Gateway's patent misuse defense fails for the same reasons.  Therefore, Plaintiffs' motion for summary judgment on Gateway's defense of patent misuse is **GRANTED**.

## V.    CONCLUSION

For the reasons herein, the Court rules as follows:

**Cross-motions**

**License**
| | |
|---|---|
| Plaintiffs' motion | **GRANTED** |
| Defendants' motions | **DENIED** |

**Unclean Hands**
| | |
|---|---|
| Plaintiffs' motion | **GRANTED** |
| Defendants' motions | **DENIED** |

**Legal Estoppel**
| | |
|---|---|
| Plaintiffs' motion | **GRANTED** |
| Gateway's motions | **DENIED** |

**Equitable Estoppel**
| | |
|---|---|
| Plaintiffs' motion | **GRANTED** |
| Gateway's motions | **DENIED** |

**Plaintiffs' motions**

| | |
|---|---|
| Exhaustion | **GRANTED** |

| | |
|---|---|
| Breach of Contract | **GRANTED** |
| Third Party Beneficiary | **GRANTED** |
| Breach of Good Faith and Fair Dealing | **GRANTED** |
| Tortious interference with Contract | **GRANTED** |
| Tortious Interference with Prospective Economic Advantage | **DENIED** |
| Violation of Sherman Act § 1 | **GRANTED** |
| Violation of Sherman Act § 2 Monopolization | **GRANTED** |
| Violation of Sherman Act § 2 Attempted Monopolization | **GRANTED** |
| Patent Misuse | **GRANTED** |

**IT IS SO ORDERED.**

DATED:  October 1, 2007

Hon. Rudi M. Brewster
United States Senior District Judge

cc:  Magistrate Judge Bencivengo
     All Counsel of Record